**TRACTOR SUPPLY COMPANY,**

       **Plaintiff,**

**v.**

**ACE AMERICAN INSURANCE COMPANY, UNIFIRST CORPORATION, and ESIS, INC.,**

       **Defendants.**

**Case No. 3:21-cv-00619**
**Judge William Campbell**
**Magistrate Judge Holmes**

**Jury Demanded.**

---

### UNIFIRST'S NOTICE OF NEW AUTHORITY RELATED TO UNIFIRST'S MOTION TO COMPEL ARBITRATION AND DISMISS

Defendant UniFirst Corporation ("UniFirst") hereby submits this Notice of New Authority Related to UniFirst's Motion to Compel Arbitration and Dismiss (D.E. 94; "Motion"). That new authority is the attached case *Commercial Painting Co. Inc. v. The Weitz Co. LLC*, Slip Copy, 2022 WL 737468 (Tenn. Ct. App. Mar. 11, 2022), *No Application For Permission to Appeal filed as of the date of this filing*.

The Motion asserts that Plaintiff Tractor Supply Company's ("TSC") fraud claim is barred by Tennessee's economic loss doctrine. Memorandum of Law in Support of Defendant UniFirst Corporation's Motion to Compel Arbitration and Motion to Dismiss (D.E. 95) at 21. TSC argued in its Response to UniFirst's Motion to Compel Arbitration and Dismiss (D.E. 101; "Response"), that Tennessee's economic loss doctrine only applies to transactions relating to the sale of goods. "A close reading of *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, upon which UniFirst relies, indicates that Tennessee's economic loss doctrine covers only loss relating to goods. 627 S.W.3d 125, 129 (Tenn. 2021)." Response at 15.

The Tennessee Court of Appeals ruled in the *Commercial Painting Co. Inc. v. The Weitz Co. LLC* case as follows:

> [T]here is no dispute that in this case, like in *Milan Supply Chain*, the contract was negotiated by sophisticated commercial entities. *Thus, the only question presented in this appeal is whether the economic loss rule should be extended to apply to non-products liability contracts between sophisticated commercial entities, and, if so, whether Commercial Painting's fraud claim is an exception to the rule.* . . .
>
> *In sum, the Tennessee Supreme Court's reasons for adopting a limited fraud exception to the economic loss rule apply with equal force outside the products liability context when the contract at issue was negotiated between sophisticated commercial entities.* Here, both parties are sophisticated commercial business entities. The parties' contract was drafted after negotiation and investigation by the parties. The misrepresentations as [sic] issue here clearly involved the subject matter of the parties' agreement. . . . There can also be little dispute that the damage that allegedly resulted from Weitz's tortious conduct completely overlaps with the damage that resulted from their breach of contract; indeed, Commercial Painting insists in this appeal that a single damage calculation included in an exhibit is proof of the damage that resulted from all the various causes of action that it asserts. As a result, we must conclude that Commercial Painting's fraud claim is barred by the economic loss rule and must be dismissed.

*Commercial Painting Co. Inc. v. The Weitz Co. LLC*, Slip Copy, 2022 WL 737468 at *23-*24 (Tenn. Ct. App. Mar. 11, 2022) (emphasis added).

As noted above, no Application For Permission to Appeal that case has been filed as of the date of this filing. If such application is filed, UniFirst will notify the Court of the Tennessee's Supreme Court's decision related to such application.

Respectfully submitted,

*/s/Andrew J. Pulliam*
Andrew J. Pulliam (TN Bar #016863)
J. Graham Matherne (TN Bar #011294)
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1050
Nashville, Tennessee 37201
(615) 244-0020 / Fax (615) 256-1726
apulliam@wyattfirm.com

*Attorneys for Defendant UniFirst
Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2022, a true and correct copy of the foregoing was served via the Court's ECF System on the following:

Mark M. Bell
Kevin T. Elkins
Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
*Attorneys for Plaintiff*


E. Todd Presnell
Bradley Arant Boult Cummings LLP
Roundabout Plaza, 1600 Division Street, Suite 700
Nashville, Tennessee  37203

Alissa K. Christopher
Cozen O'Connor, P.C.
1717 Main Street, Suite 3100
Dallas, Texas 75201

*Attorneys for Defendant ESIS, Inc.*


Alfred C. Warrington, V
Clyde & Co. US LLP
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131

William Bryan Jakes III
Howell & Fisher, PLLC
3310 West End Avenue, Suite 550
Nashville, Tennessee 37203

*Attorneys for Defendant ACE American Insurance Company*

/s/Andrew J. Pulliam

100718057.1

3

2022 WL 737468

Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

COMMERCIAL PAINTING COMPANY INC.

v.

THE WEITZ COMPANY LLC ET AL.

No. W2019-02089-COA-R3-CV

|

February 16, 2021 Session

|

03/11/2022

**Appeal from the Chancery Court for Shelby County**

**No. CH-06-1573 JoeDae L. Jenkins, Chancellor**

This is the third appeal arising from a commercial construction project. Most recently, the case went to trial before a jury, which awarded the plaintiff subcontractor $1,729,122.46 in compensatory damages under four separate theories and $3,900,000.00 in punitive damages. The trial court further awarded the plaintiff pre- and post-judgment interest and attorney's fees and costs. We conclude the economic loss rule is applicable to construction contracts negotiated between sophisticated commercial entities and that fraud is not an exception under the particular circumstances of this case. Because punitive damages and interest are not authorized under the parties' agreement, those damages are reversed. The compensatory damages of $1,729,122.46 awarded for breach of contract are affirmed. The award of attorney's fees incurred at trial are vacated for a determination of the attorney's fees incurred in obtaining the compensatory damages award. No attorney's fees are awarded on appeal. We therefore reverse in part, affirm in part, and vacate in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part; Affirmed in Part; Vacated in Part and Remanded**

**Attorneys and Law Firms**

Philip E. Beck, Atlanta, Georgia; Jeffrey C. Smith, Memphis, Tennessee; John A. Templer, Jr., Des Moines, Iowa, for the appellants, Federal Insurance Company (NJ), St. Paul Fire & Marine Insurance Company, and The Weitz Company, LLC.

Scott A. Frick, Memphis, Tennessee, for the appellees, Commercial Painting Company, Inc., and Liberty Mutual Insurance Company (MA).

Gregory L. Cashion, Nashville, Tennessee, for the Amicus Curae, Associated General Contractors of America and Associated General Contractors of Tennessee, Inc. In support of Defendants/Appellants

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J. and CARMA DENNIS MCGEE, J., joined.

**OPINION**

J. STEVEN STAFFORD, JUDGE

**I. BACKGROUND**

**\*1** This is the third appeal in this case. *See Com. Painting Co., Inc. v. The Weitz Co., LLC*, No. W2013-01989-COA-R3-CV, 2016 WL 3519015, at *1 (Tenn. Ct. App. June 20, 2016) ("*Commercial Painting II*"); *Com. Painting Co. v. Weitz Co., LLC*, No. W2013-01989-COA-R3-CV, 2014 WL 6453799, at *1 (Tenn. Ct. App. Nov. 18, 2014) ("*Commercial Painting I*"). The genesis of this lawsuit is a contract dispute between general contractor, Defendant/Appellant The Weitz Company, Inc. ("Weitz"), and its drywall subcontractor Plaintiff/Appellee Commercial Painting Company, Inc. ("Commercial Painting"). Around the end of 2003, Weitz entered into a contract ("the Prime Contract") with the owner of the project to construct a continuing care retirement community ("the Project"). In connection with the Prime Contract, Weitz and its sureties (together with Weitz, "Appellants"), issued a payment bond that obligated them to pay for labor, materials, and equipment furnished for use in the performance of the Prime Contract. The payment bond, however, became void if Weitz made prompt payment for all sums due. The payment bond was properly registered.

In October 2003, Commercial Painting bid on the drywall portion of the project. Weitz decided to award the drywall work to Commercial Painting after receiving this bid. Eventually, Mark Koch, on behalf of Commercial Painting as its President, executed a subcontract with Weitz ("the Subcontract") on November 1, 2004, with an effective date of September 28, 2004. At that time, Mr. Koch reviewed the terms of the Subcontract, made some changes to it, and initialed every page of the 93-page document.

The Subcontract establishes a "Subcontract Sum" of $3,222,400.00 as the agreed-upon price that Commercial Painting was entitled to in exchange for full performance on the Subcontract. The Subcontract referenced various drawings and specifications from the Prime Contract to which Commercial Painting's work was required to adhere. In some areas, Commercial Painting was required to perform a Level 3 drywall finish, while in other areas a Level 5 drywall finish was required. Whether Commercial Painting actually performed at this level would become an issue of much dispute as the project progressed.

The Subcontract also required that Commercial Painting's work be performed according to Weitz's project schedule and authorized Weitz to add extra work to Commercial Painting's scope of work. In order to do so, however, the Subcontract indicated that the work would be "authorized in writing in advance" by Weitz. The Subcontract also addressed the payment process and authorized Weitz to deduct from its payments to Commercial Painting any amount necessary to protect Weitz or the owner from losses related to Commercial Painting's untimely, defective, or non-conforming work. The Subcontract further provided that the Project schedule could be updated periodically to reflect actual job progress. But the Subcontract obligated Commercial Painting to provide sufficient crews, materials, and equipment to maintain or improve Weitz's schedule and gave Weitz the authority to reschedule or re-sequence Commercial Painting's work. Finally, the Subcontract contained the following provisions related to damages:

**\*2 5.6 <u>Adjustments to Subcontract Time</u>**

[Commercial Painting] shall be entitled to an extension of the Subcontract Time and/or reimbursement for delay damages only to the extent that the [Weitz] actually receives an extension of time and/or reimbursement for delay damages under the Prime Contract for events pertaining to the [Commercial Painting's] Work. Except to the extent of the foregoing passthrough rights, [Commercial Painting] hereby waives and releases [Weitz] from any and all Claims for such delay damages including without limitation

Claims attributable to breach of contract or tort and whether caused by [Weitz], Owner or other persons for any reason or cause whatsoever, and regardless of whether any such delay or other conduct on the part of [Weitz], Owner or other person may be deemed unreasonable or was not contemplated by the parties.
\* \* \*

**11.6 <u>Contract Terms Control</u>**

In no event shall [Weitz] be obligated to pay [Commercial Painting] any anticipatory profit or indirect, special, or consequential damages, however caused, and [Commercial Painting] hereby waives all such Claims. Without limiting the generality of the foregoing, [Commercial Painting] specifically agrees that it shall not be entitled to assert, and it hereby waives, any Claims in quantum meruit, interest on late payments, or any other measure of damages other than as specifically provided in items 11.4 and 11.5 above.

Item 11.4 governed termination of the relationship by Weitz for cause; this section generally entitled Commercial Painting to the unpaid balance on the Subcontract Sum minus Weitz's expenses in completing the project.[1] If these expenses exceeded the unpaid balance, then Commercial Painting's surety was obligated to pay the difference. Item 11.5 provided that if the agreement was terminated by Weitz without cause, then Commercial Painting was entitled to pro-rata payment of the Subcontract Sum for work timely and properly performed and for proven loss with respect to materials, equipment, machinery, and tools, to the extent that Weitz is able to recover these sums from the owner.[2]

**\*3** According to our prior Opinion,

Allegedly, at the time the parties entered into the subcontract, Weitz was already approximately six to eight months behind schedule on the project. Commercial Painting would later assert that Weitz improperly and unreasonably compressed construction schedules in order to make up for the delay on the project. According to Weitz, however, the project became further behind once Commercial Painting began working on the project in the winter of 2004 due to Commercial Painting's allegedly poor workmanship and failure to provide enough workers to timely complete the project. Because of this, Weitz allegedly began negotiating with the project owner regarding an extension on the contract completion date. It appears that the project owner eventually allowed a six-month extension, but Commercial Painting was only informed that an extension of approximately four months had

been granted. According to Commercial Painting, Weitz intentionally and fraudulently failed to disclose the full extent of the extension, in violation of the letter and spirit of the contract. Even with the extension, however, Commercial Painting alleged that Weitz continued to compress its schedules and improperly supplement its work because the extension did not entirely mitigate the eight-month delay on the project.

As previously discussed, the parties also disagreed as to the level of work required by the contract, and both parties asserted that they incurred additional delays and additional costs to bring the work to the desired level. Eventually, Weitz hired additional workers to supplement the work done by Commercial Painting, alleging that it was required due to Commercial Painting's delays. Commercial Painting objected to the supplementation and later alleged that they were required to perform even more work to correct the work of the supplemental workers. At the conclusion of the contract, Weitz paid Commercial Painting on Pay Applications 1 through 12. However, Weitz refused to pay Commercial Painting on Pay Applications 13 through 17, which allegedly included previously agreed-upon work, as well as additional work beyond the contract amount.

Commercial Painting filed a complaint for damages on August 11, 2006, seeking an award of $1,929,428.74, constituting damages for unpaid progress payments, interest on retainage, extra work, unjust enrichment, plus attorney's fees and interest. In addition to its claims against Weitz, Commercial Painting also sought a judgment against Weitz's sureties [Federal Insurance Company and St. Paul Fire & Marine Insurance Company "Weitz's sureties," and together with Weitz, "Appellants"].[3] [Appellants] filed an Answer and Counterclaim on January 24, 2007, seeking $500,000 for costs incurred on the project due to delays caused by Commercial Painting. [Appellants] claimed an additional $233,217.51, representing damages under the liquidated damages provisions of the parties' contract, as well as increased management expenses resulting from the need for additional supervision of the supplemental workers retained by Weitz to complete the project.

**\*4** ⚠️ *Commercial Painting I*, 2014 WL 6453799, at \*1–2 (footnote omitted).

The trial court granted partial summary judgment to Appellants on Commercial Painting's tort, rescission, and punitive damages claims. A bench trial commenced in January 2012. Eventually, the trial court awarded Commercial Painting a judgment of $450,464.26, but later

reduced the judgment to $448,874.26. The trial court further awarded Commercial Painting $75,000.00 in attorney's fees, and $50,000.00 in expert's fees, thus increasing the total amount of the judgment to $573,874.26. *Id.* at \*3.

The Court of Appeals vacated the trial court's judgment and remanded for reconsideration in light of *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303 (Tenn. 2014). *See id.* at \* 6. The Tennessee Supreme Court subsequently granted Appellants' application for permission to appeal and remanded the case to the Court of Appeals for reconsideration under the new summary judgment standard announced in *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235 (Tenn. 2015). *See Commercial Painting II*, 2016 WL 3519015, at \*2. In *Commercial Painting II*, we reversed the trial court's decision to grant partial summary judgment to Weitz on the claims for both negligent and intentional misrepresentation. As a result, the judgment entered following the bench trial was vacated and the case was remanded back to the trial court for further proceedings. *Id.* at \*12.

Commercial Painting thereafter obtained leave of court to file a Second Amended Complaint, which was filed on June 16, 2017. Appellants filed an answer and counterclaim on July 17, 2017, which answer raised several new defenses. Commercial Painting responded with an answer to the counterclaim and a jury demand on July 20, 2017. On August 2, 2017, Appellants filed a motion to strike the jury demand. Eventually, the trial court denied Appellants' motion to strike by order of October 19, 2017.

A jury trial began on September 17, 2018, on claims of negligent and intentional misrepresentation, breach of contract, unjust enrichment, as well as a request for damages pursuant to the payment bond. Commercial Painting presented proof that Weitz misled them from the very beginning of the relationship with regard to the bids made by other subcontractors, how far behind the Project was, and the fact that Weitz had received an extension on the time contracted for completion of the Project. In addition, before the Subcontract was signed, a representative from Weitz urged Commercial Painting to expedite delivery of Commercial Painting's payment and performance bonds. According to Commercial Painting, the execution of these bonds meant that Commercial Painting was required to complete work on the Project no matter what Weitz demanded.

According to Commercial Painting, the delays on the Project only got worse as time went on. In order to

recover from the delays, by at least November 2004, Commercial Painting claimed that Weitz decided to compress the schedule on the work to be completed, which involved allegedly improper supplementation of Commercial Painting's work and the work of other contractors. Mr. Koch testified that he would not have signed the Subcontract had he known that Weitz was contemplating compressing the construction schedule to make up for delays in the Project that were not attributable to Commercial Painting. Moreover, the compression of the schedule led Commercial Painting to perform extra work that was not contemplated under the Subcontract. According to the proof submitted by Commercial Painting, however, Weitz refused to execute change orders reflecting the extra work performed and thereafter refused to pay for such work.

**\*5** As for the schedule attached to the Subcontract, Mr. Koch admitted that he was aware when he signed the Subcontract in November 2004 that the attached schedule was "ten months out-of-date[.]" Mr. Koch also admitted that he knew before the Subcontract was signed that Weitz wanted to complete the Project early. But Mr. Koch testified that he relied not necessarily on the final completion date for the Project, but the durations allowed to complete certain tasks. When Weitz compressed the schedule, he asserted, it altered the durations under the contract to Commercial Painting's detriment.

At trial, Mr. Koch presented an exhibit that he asserted calculated the amounts due under the Subcontract, which included the revised Subcontract Amount, fully executed change orders, and change order requests for extra work. The calculation then subtracted amounts related to work that was not performed by Commercial Painting due to supplementation. Thus, Commercial Painting claimed that it suffered $1,835,075.56 in actual damages as a result of Weitz's conduct. Weitz disputed much of the damages, including all extra work that was not authorized by signed change orders, as it argued was required under the Subcontract.

On October 5, 2018, the trial court entered an order denying Appellants' motion for directed verdict as to Commercial Painting's claims. The trial concluded on October 18, 2018, when the jury found in favor of Commercial Painting, awarding $1,729,122.46 in compensatory damages in addition to prejudgment interest. Specifically, the jury found in favor of Commercial Painting on four of the theories alleged: breach of contract;[4] unjust enrichment/quantum meruit; intentional misrepresentation;[5] and the payment bond.[6] The jury further concluded that Weitz was liable for punitive damages. After a second hearing, the jury

awarded Commercial Painting $3,900,000.00 in punitive damages.

Several post-trial orders were entered throughout the end of 2018. First, on October 11, 2018, the trial court entered an order granting the parties' motions to amend the pleadings to conform to the evidence. On the same day, the parties filed a stipulation regarding a $456,170.00 extrajudicial payment that would be credited against the compensatory damages, which reduced the amount owed on the compensatory damages to $1,272.952.46. The next day, the trial court entered an order approving the jury verdict. On October 15, 2018, the trial court entered an order denying Appellants' motion for a directed verdict that was lodged after the close of all proof.

On October 29, 2018, Commercial Painting filed a motion to determine prejudgment and post-judgment interest, which was later supported by the affidavits of counsel and Commercial Painting's accountant. Commercial Painting amended this motion on November 16, 2018. On November 19, 2018, Commercial Painting filed a motion for an award of attorney's fees and costs, as well as for the entry of a final judgment; this motion was also later supplemented with affidavits.

> **\*6** On December 12, 2018, the trial court entered an order captioned as follows: Order Adopting Findings Of Facts And Conclusions Of Law Supporting Punitive Damages Award, Granting Motion To Determine Amount Of Prejudgment Interest To Be Added To Final Judgment And Determination Of Post-Judgment Interest Rate, Granting Motion For Award Of Attorney's Fees, Expenses And Costs And For Entry Of Final Judgment And Order Of Final Judgment.

This order approved the punitive damages awarded by the jury in their entirety. In addition, the trial court award Commercial Painting a $2,083,362.16 judgment for pre-judgment interest, as well as costs and attorney's fees in the amount of $1,103,549.00. In addition, the trial court ruled that Commercial Painting was entitled to post-judgment interest. Thus, the trial court awarded Commercial Painting a total judgment of $8,359,863.83, plus post-judgment interest.[7]

On January 11, 2019, Commercial Painting filed a motion to alter or amend the judgment to include revocation of Weitz's contractor's license. On the same day, Appellants filed three motions: (1) to alter or amend the order approving the second application of the Special Master for compensation and expenses; (2) a motion for judgment notwithstanding the verdict; and (3) a motion for new trial. Both parties responded to each other's post-trial motions. A hearing on the post-trial motions occurred on February 13, 2019.

On October 31, 2019, the trial court entered separate orders denying Commercial Painting's motion to alter or amend, as well as Appellants' motion to alter or amend, motion for new trial, and motion for judgment notwithstanding the verdict. On November 20, 2019, the trial court entered an order setting an appeal bond. On November 26, 2019, Appellants filed their notice of appeal with this Court.

## II. ISSUES PRESENTED

Appellants raise the following issues for review, which are taken, with slight restatements, from their brief:

1. Whether the trial court's decision must be reversed because it is internally inconsistent and it is irreconcilable with Tennessee law.

2. Whether the trial court erred in awarding non-contractual damages, including punitive damages, against Weitz in this breach of contract case.

   a. Whether the award of non-contractual and punitive damages in this case is barred by the Economic Loss Doctrine.

   b. Whether the award of non-economic and punitive damages in this case is barred by the Independent Duty Doctrine.

   c. Whether the award of punitive damages in this case is inappropriate given that Tennessee law prohibits an award of punitive damages in a breach of contract case except in very unusual and narrow circumstances, which are not present here.

   d. Whether the award of non-economic and punitive damages in this case is inappropriate given that they are expressly barred by the undisputed terms of the fully integrated written subcontract, which governed and which established the parties' relationships, rights, and responsibilities, and included a waiver of non-contractual and punitive damages.

3. Whether the trial court erred in deferring to the jury without properly fulfilling the trial court's role.

   a. Whether the trial court erred by failing to follow this Court's directions in remanding the case on June 20, 2016.

*7 4. Whether the trial court's jury instructions and verdict form were defective and confused the jury, resulting in an inconsistent and flawed jury verdict; and whether the trial court erred in blindly entering a judgment based upon that inconsistent and flawed jury verdict, given that:

   a. The defective jury instructions and verdict form led the jury to believe that it could and should award some damages under multiple, inconsistent, and conflicting legal theories against different defendants.

   b. The trial court failed to fulfill its responsibility to evaluate the jury's verdict, in violation of Tennessee law.

   c. The trial court simply adopted the jury's verdict and adopted Plaintiff's proposed Findings of Fact, Conclusions of Law, Order, and Judgement virtually verbatim (changing only one word in a 43-page Order), without a hearing; without any critical, objective determination of whether Tennessee law supports them; and in violation of the *Lakeside* rule and Tennessee law.

5. Whether the trial court erred in awarding prejudgment interest, post-judgment interest, attorney's fees, and costs contrary to the terms of the Subcontract and Tennessee law.

6. Whether the trial court's award of $3.9 million in punitive damages in this case was reversible error even if the Court were to conclude that punitive damages can be awarded in a case of this type under Tennessee law.

In the posture of appellee, Commercial Painting seeks an award of attorney's fees incurred on appeal.

## III. ANALYSIS

### A.

We begin with Appellants' argument that the verdict is internally inconsistent and irreconcilable with Tennessee law.[8] As we perceive it, Appellants' argument is two-fold. First, they focus on the jury's finding that Commercial Painting had proven both a breach of contract claim and a claim for quantum meruit, which Appellants argue is a legal impossibility. Second, they take issue with the jury's decision to award the exact same amount of damages under four different theories.

To start, Appellants first argue that the jury's verdict violates the election of remedies doctrine. "The election of remedies doctrine ... is a recognized part of Tennessee's jurisprudence. The doctrine prohibits and estops a plaintiff from seeking inconsistent remedies once a clear choice has been made to pursue a specific remedy." *Wimley v. Rudolph*, 931 S.W.2d 513, 515 (Tenn. 1996) (citing *Barger v. Webb*, 216 Tenn. 275, 391 S.W.2d 664 (1965)). Respectfully, we disagree that any error as to this doctrine is present in this case.

**\*8** As an initial matter, we note that Rule 8.05 of the Tennessee Rules of Civil Procedure permits alternative pleading:

> A party may set forth two or more statements of a claim or defense alternatively or hypothetically. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he or she has, regardless of consistency.

Tenn. R. Civ. P. 8.05(b). Moreover, this Court has expressly held that the sole purpose of the election of remedies doctrine is to prevent double compensation for the same wrong:

> As an initial matter, although Tennessee recognizes the election of remedies doctrine, its "sole purpose is to 'prevent double redress for a single wrong.' " *Rolen v. Wood Presbyterian Home, Inc.*, 174 S.W.3d 158, 162 (Tenn. Ct. App. 2005) (quoting *Concrete*

*Spaces, Inc. v. Sender*, 2 S.W.3d 901 (Tenn. 1999)). As such, this Court has recognized on multiple occasions that alternative theories may be maintained as late as presentation to the jury or even following verdict. *See* *Concrete Spaces*, 2 S.W.3d at 906 (stating that election of remedies comes into play when the jury finds two types of damages may be awarded); *Cascade Ohio, Inc. v. Modern Mach. Corp.*, No. E2009-01948-COA-R3-CV, 2010 WL 4629467, at *13 (Tenn. Ct. App. Nov. 15, 2010) ("A buyer that is damaged by a breach of contract involving a misrepresentation can elect, as late as after the verdict comes in, between rescission of the contract and recovery of the purchase price, or damages."); *Goodman v. Jones*, No. E2006-02678-COAR3-CV, 2009 WL 103504 at *9–10 (Tenn. Ct. App. Jan. 12, 2009) ("If an election must be made in order to avoid a 'double recovery,' it should be made after the jury has rendered its verdict with its answers to specific questions.").

*Dallas v. Shelby Cty. Bd. of Educ.*, 603 S.W.3d 32, 46–47 (Tenn. Ct. App. 2019), *perm. app. denied* (Tenn. Apr. 1, 2020). Thus, alternative theories may be maintained "even following verdict." *Id.* at 47 (citing *Concrete Spaces*, 2 S.W.3d at 906). Indeed, this holding is entirely consistent with our statements in *Commercial Painting II*, which explained that

> Commercial Painting is entitled to just one recovery to the extent damages from more than one cause of action overlap, but it should not be precluded from proceeding on multiple theories of liability if it is able to make out a prima facie case under more than one cause of action.

*Commercial Painting II*, 2016 WL 3519015, at *12. Appellants have not designated as an issue that Commercial Painting received a double recovery in this case or that it failed to make out a prima facie case as to either the breach of contract or quantum meruit theories. As such, there is no reversible error in the jury's verdict in this regard.

Appellants next contend that the jury's verdict is inconsistent and irreconcilable with Tennessee law because it awarded the same amount under four different

theories of recovery, all of which have a different measure of damages. According to Appellants, Commercial Painting only presented proof of damages under a single theory—breach of contract. As a result, they argue that all damages resulting from the other theories must be reversed as inconsistent.[9]

**\*9** In considering this issue and many of the issues that follow, we keep the following principles in mind:

> Of course, in testing the validity of a plaintiff's jury award we must view the evidence in the light most favorable to plaintiff. This court has no right to weigh the evidence in a jury case, but must indulge every reasonable inference in favor of the plaintiff when there is material evidence in support of the verdict. *Houser v. Persinger*, 57 Tenn.App. 401, 405, 419 S.W.2d 179, 181 ([Tenn. Ct. App.] 1967). We must look at all the evidence, take the strongest legitimate view of it in favor of the plaintiff and allow all reasonable inferences in plaintiff's favor. *Norman v. Liberty Life Assurance Co.*, 556 S.W.2d 772, 773 (Tenn. [ct.] App. 1977); *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn. 1979). Our duty upon review of conflicting evidence in a jury trial is not to determine where the truth lies, but only to determine if there was any material evidence to support the verdict below. *Davis v. Wilson*, 522 S.W.2d 872, 875 (Tenn. [Ct.] App. 1974); *Chattanooga Gas Co. v. Underwood*, 38 Tenn.App. 142, 149, 270 S.W.2d 652, 655 (1954). Even if we would have reached conclusions different from those reached by the jury, if there is some material evidence to support the verdict, it must be affirmed. *Davis v. Wilson, supra; Chattanooga Gas Co. v. Underwood, supra* at 149–150, 270 S.W.2d at 655–656.

*Mason v. Tennessee Farmers Mutual Insurance Co.*,

640 S.W.2d 561, 564 (Tenn. Ct. App. 1982).

Commercial Painting asserts, however, that any argument concerning the same damages amount for each theory was waived at trial by Appellants. Specifically, Commercial Painting points, *inter alia*, to a colloquy that occurred after the jury asked the precise question that is at issue here: "[C]an all the blanks be the same amount?" Counsel for Appellants insisted that "[i]t could be zeros across the board." When the trial court then asked if everyone agreed that the answer to the above question was yes, counsel for Appellants agreed.

In general, parties are not entitled to relief if they are responsible for the error or failed to take corrective action that was available to prevent or nullify the error. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Here, Appellants readily agreed that the jury could choose the same figure for each theory of relief in the hope that the figure the jury chose would be zero. Alas, the jury did not choose to award nothing to Commercial Painting. But in Appellants' efforts to secure its most favorable outcome, they waived any objection to the jury's decision to award the same figure to Commercial Painting for all its theories. As a result of Appellants' own acquiescence, there is no reversible error.[10]

### B.

We next consider whether the trial court erred in allowing Commercial Painting to amend its complaint to include a jury demand. Although the right to a jury trial is guaranteed by the Tennessee Constitution, *see* Tenn. Const. art. I, § 6, "the right is not selfenforcing." *Nagarajan v. Terry*, 151 S.W.3d 166, 174 (Tenn. Ct. App. 2003). Instead, a party must request a jury trial pursuant to Rule 38.02 of the Tennessee Rules of Civil Procedure:

> **\*10** Any party may demand a trial by jury of any issue triable of right by jury by demanding the same in any pleading specified in Rule 7.01 or by endorsing the demand upon such pleading when it is filed, or by written demand filed with the clerk,

with notice to all parties, within 15 days after the service of the last pleading raising an issue of fact.

Tenn. R. Civ. P. 38.02. "The failure of a party to make demand as required by this rule constitutes a waiver by the party of trial by jury." Tenn. R. Civ. P. 38.05. As a result,

Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the court; but, notwithstanding the failure of a party to demand a jury as to any issue with respect to which demand might have been made of right, the court in its discretion upon motion may order a trial by jury of any or all issues.

Tenn. R. Civ. P. 39.02; *see also* 🔖 *Nagarajan*, 151 S.W.3d at 175 ("Trial courts may, in their discretion, order a trial by jury notwithstanding a party's failure to demand a jury in the interest of justice.").

Courts interpreting these rules have held that "[i]t is now well settled that where the amendment creates new jury issues, a party upon timely demand therefor is entitled to a jury trial, if the amended pleading sets forth new factual issues and not merely a different legal theory." 🔖 *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 135 (Tenn. 2001) (quoting *Trimble v. Sonitrol of Memphis, Inc.*, 723 S.W.2d 633, 640 (Tenn. Ct. App. 1986)). An amended claim does not raise new factual issues if it merely contains " 'a more detailed statement of the same charge' as in the original complaint." *Trimble*, 723 S.W.2d at 640 (quoting *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045 (9th Cir. 1974)).

There is no dispute that Commercial Painting did not demand a jury trial in its first complaint, first amended complaint, or second amended complaint. Indeed, this case originally was tried by bench trial. Following the remand in *Commercial Painting II*, however, Appellants filed an amended answer and counterclaim. Therein, Appellants raised a number of new defenses. Appellants assert, however, that these new defenses raised only new issues of law, not of fact. Respectfully, we disagree. Some

of Appellants' new defenses raise factual, rather than legal, issues that triggered Commercial Painting's right to request a jury. Take for example, Appellants' "Fourteenth Defense." In the 2010 amended answer, this defense merely stated that Appellants reserved the right to amend their answer to assert new defenses. The 2017 amended answer, however, asserted the following: "Statements in construction schedules regarding future planned activities and completion dates do not constitute statements of material fact and cannot form the basis for either Commercial Painting's intentional misrepresentation or its negligent misrepresentation claim."

Appellants offer no legal authority for their assertion that the issue of whether a statement constituted a material fact is a question of law to be resolved by the court. Instead, our research has revealed support for the opposite conclusion. *See Ladd by Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 101 (Tenn. Ct. App. 1996) (citing 🔖 *Stamp v. Honest Abe Log Homes, Inc.*, 804 S.W.2d 455, 458 (Tenn. Ct. App. 1990); *Mackie v. Fuqua*, 14 Tenn. App. 176, 185 (Tenn. 1931)) ("A misrepresentation claim should be submitted to the jury when the representation at issue may reasonably be interpreted either as an expression of opinion or as a statement of fact."). As such, we must conclude that the 2017 amended answer, the last pleading before Commercial Painting demanded a jury trial, did raise new factual issues that triggered Commercial Painting's right to seek a new jury trial. *See* 🔖 *BVT Lebanon*, 48 S.W.3d at 135. As such, we cannot conclude that the trial court abused its discretion in allowing Commercial Painting to demand a jury trial at such a late date.[11]

**\*11** Even if the 2017 amended answer raised new factual issues, Appellants contend that the trial court erred in allowing the jury trial because to do so was beyond the scope of the remand. In support, Appellants cite two cases from 1993 in which we declined to conclude that the trial court had abused its discretion in denying a party's request for a jury trial following a remand. Respectfully, we conclude that both cases are distinguishable.

First, in 🔖 *Zaharias v. Vassis*, No. 01-A-01-9207-CH00266, 1993 WL 11709, at \*2 (Tenn. Ct. App. Jan. 22, 1993) ("*Zaharias II*"), the case was remanded "for the presentation of proof excluded by the Chancellor and the consideration by him of such proof to determine the derivative rights of the plaintiff, if any, and any other proof or proceedings that may be required and enter such decree as justice requires." 🔖 *Zaharias v. Vassis*, 789 S.W.2d 906, 911 (Tenn. Ct. App. 1989). On remand, the defendant insurance company requested a

jury trial, which was denied by the trial court. *Zaharias II*, 1993 WL 11709, at *1. We concluded that the denial was proper "because the second proceeding was merely a continuation of the first at which the insurance company waived its jury demand." *Id.* at *2. Indeed, nothing in the *Zaharias II* Opinion indicates that any party filed an amended pleading raising new factual issues. Thus, the requirements outlined above were not met. The same is generally true in the other case cited by Appellants, *St. Clair v. Evans*, 857 S.W.2d 49, 50 (Tenn. Ct. App. 1993). There, the case was remanded solely to add the plaintiff's mother as a party. Other than this change, "the amended complaint [wa]s identical to the original complaint[.]" *Id.* at 50.

The same is not true in this case. As previously discussed, the parties were permitted to file amended pleadings. Appellants' 2017 amended answer raised new factual issues. Moreover, the original judgment following the bench trial was vacated by this Court and remanded for further proceedings. Specifically, we "vacate[d] the trial court's judgment and award of damages following the trial, and remand[ed] the case for further proceedings consistent with this opinion." *Commercial Painting II*, 2016 WL 3519015, at *12. The term "vacate" means "[t]o nullify or cancel; make void; invalidate." *Black's Law Dictionary* 1688 (9th ed. 2009). Thus, the judgment from the prior trial was nullified by the decision in *Commercial Painting II*. The remand was therefore not simply a continuation of the prior proceeding, but more akin to a fresh start.

Moreover, the trial court's compliance with our mandate must be measured in light of "the larger opinion of the appellate court." *Larry E. Parrish, P.C. v. Strong*, No. M2020-01145-COA-R3-CV, 2021 WL 4471113, at *4 (Tenn. Ct. App. Sept. 30, 2021). The trial court " 'may examine the rationale of an appellate opinion in order to discern the meaning of language in the court's mandate.' " *Id.* (quoting *In re Estate of McCants*, No. E2019-01159-COA-R3-CV, 2020 WL 1652572, at *4 (Tenn. Ct. App. Apr. 3, 2020)). *Commercial Painting II* clearly envisioned that a new trial would take place. Specifically, the Opinion states that Commercial Painting "should not be precluded from proceeding on multiple theories of liability if it is able to make out a prima facie case under more than one cause of action." *Commercial Painting II*, 2016 WL 3519015, at *12. Moreover, the panel explained that "[i]f Commercial Painting is successful on its intentional misrepresentation claim against Weitz, it may be entitled to recover punitive damages in addition to compensatory damages." Clearly, this language indicates that a future trial in which proof

would be presented would likely be necessary. Under these circumstances, we discern no abuse of discretion in the trial court's decision to allow Commercial Painting to demand a jury trial in the pleading following Appellants' 2017 amended answer.

## C.

**\*12** The next issue presented involves the decision to allow Commercial Painting to recover in tort, rather than solely under the contract. Commercial Painting argues that this case does not involve only contractual claims, but a claim of intentional misrepresentation—a tort.[12] As such, Commercial Painting contends that its ability to recover is not limited by the parties' contract but may include all damages that flow from the wrong, including punitive damages. In response, Appellants contend that Commercial Painting may not recover under tort theories under two separate doctrines—the independent duty rule and the economic loss doctrine.

We begin with the independent duty rule, as this argument is easily disposed of. Appellants contend that this doctrine provides that "[a] tort action only arises when the act constituting the contract breach also constitutes a breach of a common law duty *independent* of the contractual relationship.' " *E Sols. for Buildings, LLC v. Knestrick Contractor, Inc.*, No. M2018-02028-COA-R3-CV, 2019 WL 5607473, at *9 (Tenn. Ct. App. Oct. 30, 2019) (quoting *Yinghong Mach. Int'l Ltd. v. Wholesale Equip., Co.*, No. 2:13-cv-02671-JTF-cgc, 2014 WL 12887673, at *4 (W.D. Tenn. Oct. 17, 2014) (citing *Green v. Moore*, No. M2000-03035-COA-R3-CV, 2001 WL 1660828, at *3 (Tenn. Ct. App. 2001))); *see also* 21 Tenn. *Prac. Contract Law and Practice* § 1:4 (citing *Weese v. Wyndham Vacation Resorts*, No. 3:07-CV-433, 2009 WL 1884058 (E.D. Tenn. 2009)) ("Only where the act constituting a breach of contract also constitutes a breach of a legal duty independent of the contract does an action arise in tort and not in contract."). The independent duty rule is closely related to the economic loss rule to the extent that these rules may be interdependent. *See Eastwood v. Horse Harbor Found., Inc.*, 170 Wash. 2d 380, 393, 241 P.3d 1256, 1264 (2010) ("In sum, the economic loss rule does not bar recovery in tort when the defendant's alleged misconduct implicates a tort duty that arises independently of the terms of the contract."); *cf. Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 147 (Tenn. 2021) (discussing certain approaches in which fraud is not an exception to the economic loss rule because the duty to not commit fraud

is independent from the contract itself). Still, to the extent that that the independent duty rule provides a separate basis for Appellants' arguments, we conclude that it is waived.

Under Rule 3 of the Tennessee Rules of Appellate Procedure,

> In all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, *jury instructions granted or refused*, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was *specifically* stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e) (emphasis added). In this case, Appellants assert that they did ask for a jury instruction on the independent legal duty doctrine, which instruction was refused by the trial court. The problem is that Appellants thereafter did not specifically raise this ruling as an error in their motion for new trial.

**\*13** Appellants did raise the trial court's failure to provide a "complete and comprehensive" instruction to the jury. The only specific failure mentioned in the motion for new trial, however, was the trial court's alleged failure to fully instruct the jury on "the law of fraud and misrepresentation" as well as Weitz's reasonable beliefs that it was permitted to supplement Commercial Painting's work under the contract. The motion for new trial does not mention any error surrounding the independent duty rule. Although the motion for new trial's argument was more fully addressed in the memorandum of law accompanying it, Appellants did not specifically raise the issue of the independent duty doctrine in their memorandum. Instead, they once again confined their jury instruction arguments to the question of fraud and Weitz's reasonable beliefs under the contract. Because this issue was not raised in Appellants' motion for new trial, it is waived under Rule 3(e).[13]

We therefore must turn to the much more difficult question of whether the economic loss rule is applicable

in this case, as this issue was properly raised in Appellants' motion for new trial. The economic loss doctrine, or economic loss rule, is a judicially-created rule that was developed in response to concerns that "tort law would erode or consume contract law." *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 142 (Tenn. 2021) (citing *Lincoln General Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 488 (Tenn. 2009)). "It has been described as a 'judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship.' " *Id.* (quoting *Plourde Sand & Gravel v. JGI E., Inc.*, 154 N.H. 791, 917 A.2d 1250, 1253 (N.H. 2007)). In other words, the rule " 'prevents a party who suffers only economic loss from recovering damages under a tort theory." *Milan Supply Chain Sols. Inc. v. Navistar Inc.*, No. W2018-00084-COA-R3-CV, 2019 WL 3812483, at \*3 (Tenn. Ct. App. Aug. 14, 2019), *aff'd in part on other grounds*, 627 S.W.3d 125 (Tenn. 2021) (hereinafter *Milan Supply Chain COA*) (quoting Jeffrey L. Goodman et al., *A Guide to Understanding the Economic Loss Doctrine*, 67 Drake L. Rev. 1, 2 (2019)); *see also Ins. Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 24, 276 Wis. 2d 361, 372, 688 N.W.2d 462, 467 ("In general, tort offers a broader array of damages than contract. The economic loss doctrine precludes parties under certain circumstances from eschewing the more limited contract remedies and seeking tort remedies.").

The rule was first adopted by the California Supreme Court. *See generally Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (Cal. 1965). Over two decades later, it was adopted by the United States Supreme Court in an admiralty case. *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). The Court described the rule as having become the "majority land-based approach" by that time. *Id.* at 868. The purpose of the rule, according to the Supreme Court, was to prevent contract law from "drown[ing] in a sea of tort." *Id.*

Tennessee courts were not quick to adopt the economic loss doctrine. In 1991, the Tennessee Supreme Court first mentioned the doctrine, "but only fleetingly" in the context of an exception to the rule outlined in the Restatement (Second) of Torts § 552. *Milan Supply Chain*, 627 S.W.3d at 151 (citing *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn. 1991)). Then, in 1995, the Tennessee Supreme Court declined to extend that exception to claims involving products liability. *Id.*

(citing *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 132 (Tenn. 1995) ("Section 552 does not apply to products liability cases ....")). The Tennessee Supreme Court did not formally adopt the economic loss rule until 2009 in response to a certified question from a federal court. *Id.* (citing *Lincoln General*, 293 S.W.3d at 488). In that case, the plaintiff urged the Court to adopt an exception to the economic loss rule "when the defect renders the product unreasonably dangerous and causes the damage by means of a sudden, calamitous event[.]" *Lincoln General*, 293 S.W.3d at 488. The Tennessee Supreme Court declined to adopt such an exception, but did formally adopt the economic loss rule as it applied to defective products. *Id.* at 491–92.

*14 Specifically, the court adopted the majority approach, which provides a bright-line rule precluding recovery of purely economic losses when a product damages itself without causing personal injury or damage to other property. *Id.* at 489. In choosing this version of the economic loss rule, our high court agreed with the *East River* court

> that the owner of a defective product that creates a risk of injury and was damaged during a fire, a crash, or other similar occurrence is in the same position as the owner of a defective product that malfunctions and simply does not work. It follows that the remedies available to these similarly situated product owners should derive from the parties' agreements, not from the law of torts, lest we disrupt the parties' allocation of risk. To hold otherwise would make it more difficult for parties to predict the consequences of their business transactions, the cost of which ultimately falls on consumers in the form of increased prices.

*Id.* (citations omitted). The court concluded that the rule was appropriate because it "fairly balances the competing policy interests and clearly delineates between the law of contract and the law of tort." *Id.* at 492. Thus, when the economic loss rule is applicable, a party may not "recover[ ] in tort." *Milan Supply Chain*, 627 S.W.3d at 146 (quoting R. Joseph Barton, *Drowning in A Sea of*

*Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789, 1811 (2000)). Instead, a party in that situation is limited to its contractual remedies. *See Milan Supply Chain COA*, 2019 WL 3812483, at *4 (quoting Goodman et al., *supra*, at 7) (noting that the "economic loss doctrine prevents parties from subverting their contract and recovering in tort what they could not obtain through their contractual remedies").

Although the majority of jurisdictions have now adopted the economic loss rule in some form, it remains a confusing morass of permutations. *Milan Supply Chain*, 627 S.W.3d at 144 (citing *David v. Hett*, 293 Kan. 679, 683, 270 P.3d 1102, 1105 (2011); Barton, *supra*, at 1801). Instead, the Tennessee Supreme Court has cited favorably one commentator that described the rule as "a 'constellation of somewhat similar doctrines that tend to limit liability' but work in different ways in different contexts, for not necessarily identical reasons, 'with exceptions where the reasons for limiting liability were absent.' " *Id.* at 145 (quoting Oscar S. Gray, *Some Thoughts on "The Economic Loss Rule" and Apportionment*, 48 Ariz. L. Rev. 897, 898 (2006) (footnotes omitted)).

One source of confusion is the proper context of the doctrine—either limited to the product liability context in which it originated or expanded to other contexts. *Id.* (citing Barton, *supra*, at 1802 ("Although the rule originated in the context of products liability, the current trend expands the rule to apply in other contexts, most notably in real property transactions and service contracts." (footnote omitted))); *see also, e.g.*, *East River*, 476 U.S. at 866 (involving a claim in the product liability realm); *Seely*, 403 P.2d at 149 (same). Although the Tennessee Supreme Court noted that "many jurisdictions now apply the economic loss doctrine in a wide array of circumstances beyond the products liability context," it emphasized that it had yet to do so. *Milan Supply Chain*, 627 S.W.3d at 153. As such, this Court has previously held that Tennessee courts have essentially recognized two situations in which the economic loss rule is applicable: (1) "a rule that prevents purely economic losses for negligence when the plaintiff lacks privity of contract with the defendant"; and (2) a "rule that applies when a defective product damages itself without causing personal injury or damage to other property." *City of Franklin v. W.L. Hailey & Co.*, 634 S.W.3d 16, 28 (Tenn. Ct. App. 2019) (citing *Lincoln General*, 293 S.W.3d at 488–89 (adopting the second version of the rule); *John Martin*, 819 S.W.2d at 431 (involving a case where the Tennessee Supreme Court was invited to

adopt the first version of the rule)); *see also United Textile Workers of Am., AFL-CIO v. Lear Siegler Seating Corp.*, 825 S.W.2d 83, 87 (Tenn. Ct. App. 1990) (applying the first version of the rule). Courts outside Tennessee, however, have either modified the second scenario or added a third variation to encompass situations outside the product liability context. This formulation applies "when a contract exists between the parties" and "declares that when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort." *Healthbanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 195 (Utah 2018) (discussed in detail, *infra*)).

**\*15** Another relatively unsettled area of law is at issue when the plaintiff raises claims of intentional or negligent misrepresentation. Some jurisdictions have adopted exceptions to the economic loss rule in these contexts. Recently, Tennessee courts have also been tasked with determining the viability and application of these so-called exceptions in Tennessee cases. First, in *City of Franklin v. W.L. Hailey & Co.*, this Court held that Tennessee law does not recognize an exception to the economic loss doctrine for negligent misrepresentations in the product liability context. 634 S.W.3d at 34–37. Second, the Tennessee Supreme Court adopted a more nuanced rule when fraud is claimed: "for situations ... involving a contract between sophisticated commercial business entities and a fraudulent inducement claim seeking recovery of economic losses only, the economic loss doctrine applies if the only misrepresentation[s] by the dishonest party concern[ ] the quality or character of the goods sold." *Milan Supply Chain*, 627 S.W.3d at 153–54. Because the claims in this case likewise implicate fraud, we focus on the *Milan Supply Chain* opinion.

In *Milan Supply Chain*, the plaintiff, a commercial trucking company purchased a number of diesel engine trucks from the defendant seller. During the negotiations, the defendant made certain representations about the trucks, including as to the amount of testing that had occurred on them and as to the reliability of the engines. *Id.* at 132–33. The parties eventually entered into a contract that required the defendant to repair or replace defective truck components, but waived all other warranties. The contract further excluded liability for loss of time or use of the vehicle, loss of profits, inconvenience, or incidental or consequential damages. *Id.* at 133.

Eventually, the plaintiff experienced issues that led it to believe that the trucks did not meet the representations of

reliability that the defendant had given. When these issues increased, the plaintiff filed suit against the defendant seller, alleging both contract claims, negligent and fraudulent misrepresentation, and a violation of the Tennessee Consumer Protection Act ("TCPA"). *Id.* at 134. The trial court granted the defendant summary judgment as to the contract claims, concluding that the defendant had met its obligations to repair or replace the truck parts as required by the contract. The trial court further found that the contract disclaimed warranties and that the negligent misrepresentation claim was barred by the economic loss doctrine. The case went to trial only on the fraud and TCPA claims. The jury found for the plaintiff as to both claims, awarding plaintiff $8,236,109.00 in benefit-of-the-bargain damages and $2,549,481.00 in lost profit damages, for a total of $10,785,590.00 in compensatory damages. The jury also found that the plaintiff was eligible for an award of punitive damages. Following a second hearing, the jury warded $20,000,000.00 in punitive damages. *Id.* at 140. The defendant filed several post-trial motions arguing, *inter alia*, that the fraud claim was barred by the economic loss doctrine. The trial court denied the motions and entered judgment on the jury's verdict. *Id.* at 141. Both parties appealed. As is relevant to this case, we held that the economic loss doctrine barred the plaintiff's fraud claim. *See generally Milan Supply Chain COA*, 2019 WL 3812483, at *7–9. The Tennessee Supreme Court thereafter granted the plaintiff's application for permission to appeal.

One of the central questions before the Tennessee Supreme Court was whether Tennessee should recognize an exception to the economic loss doctrine for fraud. *Milan Supply Chain*, 627 S.W.3d at 145. In order to resolve that issue, the court looked at the three approaches that courts in other jurisdictions had taken to that question—the strict approach, the broad fraud exception, and the limited or narrow fraud exception. *Id.* at 146.

As the Tennessee Supreme Court explained, the strict approach bars all fraud claims. "In other words, under this approach, fraud claims are not an exception to the economic loss doctrine." *Id.* The rationale for this approach is that "the need to provide a plaintiff with tort remedies is 'diminished greatly when (1) the plaintiff can be made whole under contract law, and (2) allowing additional tort remedies will impose additional costs on society.' " *Id.* (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002), *abrogated by Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021)). The court noted, however, that the continued viability of this approach was unclear, "as the cases initially recognizing it have been overruled, abrogated, or called into question

by subsequent state court decisions." *Id.* (citing cases).

**\*16** The majority approach, the broad fraud exception, allows plaintiffs to assert fraudulent inducement claims notwithstanding the economic loss rule "because the duty not to commit fraud exists independent of any contract." *Id.* at 147. The rationale for this exception was explained by our supreme court as follows:

> These courts acknowledge that in essence, the parties to a contract create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks. Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give each party only such benefits as that party expected to receive, because this is the function of contract law. However, this universe of expectations does not merit protecting if one party commits fraud to induce the contract because a party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract. While parties, perhaps because of their technical expertise and sophistication, can be presumed to understand and allocate the risks relating to negligent product design or manufacture, those same parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction.

*Id.* (citations, brackets, and quotation marks removed). The allowance of tort damages, including punitive damages, is also appropriate in order to deter fraud. *Id.* (citing *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 992, 102 P.3d 268, 275 (2004)) ("[F]raud is socially undesirable conduct that should be punished and

deterred.").

The broad fraud exception, like the economic loss rule itself, is not uniformly devised. *Compare Robinson Helicopter*, 102 P.3d at 276 (articulating a narrow and limited version of the broad fraud exception that requires proof that the plaintiff was exposed to "liability for personal damages independent of the plaintiff's economic loss"), *with Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) ("Allowing the recovery of fraud damages sounding in tort only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under a breach of contract claim is inconsistent with this well-established law, and also ignores the fact that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement.").

Finally, the Tennessee Supreme Court discussed three cases involving the third permutation, the narrow or limited fraud exception. According to the supreme court, this permutation originated in *Huron Tool & Engineering Co. v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 532 N.W.2d 541, 545 (1995), where the Michigan Court of Appeals recognized an exception for fraud-in-the-inducement claims, but only if the fraud is "extraneous to the contract," not "interwoven with the breach of contract." *Milan Supply Chain*, 627 S.W.3d at 148 (quoting *Huron Tool*, 532 N.W.2d at 545). The rationale behind this exception was explained by the Michigan court as follows:

> Fraud in the inducement presents a special situation where parties to a contract negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.

**\*17** *Huron Tool*, 532 N.W.2d at 545.

The Wisconsin Supreme Court adopted this narrow exception in *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 283 Wis.2d 555, 699 N.W.2d 205, 220 (2005). That court

held that the narrow exception balances the purposes underlying the economic loss doctrine—i.e., the distinction between contract and tort and the protection of freedom to contract—with the need for parties to have a background of truth and fair dealing in commercial relationships. The court formulated the exception narrowly, however: "[t]ort law will apply only under circumstances ... where one party induces another to enter into a contract by representing (or failing to disclose) a fact that would be material to the other party's decision to enter into the contract, *but that concerns matters extraneous to the contract's terms.*" *Id.* (emphasis added). Thus, the fraud must be "extraneous to, rather than interwoven with, the contract." *Id.* at 219.

The most recent case involving the narrow fraud exception discussed by the Tennessee Supreme Court was *Healthbanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 194 (Utah 2018). Citing both *Huron Tool* and *Kaloti*, the Utah Supreme Court held that "there is no fraud exception that applies where the alleged fraudulent inducement arises out of the very grounds alleged as a basis for a breach of contract action." *Id.* In reaching this conclusion, the court noted that Utah courts had previously recognized two contexts in which to apply the economic loss rule: (1) "when no contractual relationship exists between the parties and the plaintiff fails to prove either physical damage to other property or bodily injury"; and (2) "when a contract exists to bar the parties from asserting actions in tort when a conflict between the parties involves the subject matter of the contract." *Milan Supply Chain*, 627 S.W.3d at 150 (citing *Healthbanc International*, 435 P.3d at 196).

Under this second category of cases, a "blanket exception for fraud in the inducement would undermine the central premises of the economic loss rule[.]" *Id.* (citing *Healthbanc International*, 435 P.3d at 196). In other words, a broad exception "would open the door to tort claims that directly overlap breach of contract claims. This blurring of the line between tort and contract law is precisely what the economic loss rule is designed to prevent." *Id.* at 197. And with regard to the concerns of some courts as to fraudulent inducements to enter into contracts, the Utah Supreme Court found such a distinction " 'illusory' '[w]hen the subject matter of the inducing promises [is] later negotiated for and included in the contract.' " *Milan Supply Chain*, 627 S.W.3d at 150 (citing *Healthbanc International*, 435 P.3d at 197 ("To claim that a promise is independent of a contract simply because it was spoken prior to the formation of a contract would open the door to tort liability for all pre-contractual negotiations that were eventually enshrined in a contract. This exception would swallow the rule. And we decline to

endorse such an exception.")). Likewise, the court rejected a claim that a broad exception was necessary to "avoid shielding intentional tortfeasors from liability[.]" *Id.* (citing *Healthbanc International*, 435 P.3d at 197 ("Intentional bad acts are insufficient by themselves to justify an exception to the economic loss rule. If the 'bad acts' (even intentional ones) are covered by a contract, they remain in the realm of contract law. And contract law remains sufficient to 'punish' the breaching party.")).

**\*18** Having detailed the forgoing options, the Tennessee Supreme Court "follow[ed] the Utah Supreme Court" by declining "to announce a broad rule either extending the economic loss rule to all fraud claims or exempting all fraud claims from the economic loss rule." *Id.* at 153. Instead, the Court held that where a situation involves a contract between sophisticated commercial entities and the plaintiff seeks to recover economic losses only, "the economic loss doctrine applies if the only misrepresentation[s] by the dishonest party concern[ ] the quality or character of the goods sold." *Id.* at 154 (quoting *Huron Tool*, 532 N.W.2d at 545). This rule, according to the supreme court, strikes "a careful balance" between the "freedom of contract and the abhorrence of fraud." *Id.*

Appellants have maintained since the outset of this appeal that Commercial Painting's claim for intentional misrepresentation is barred by the economic loss rule because the only losses that Commercial Painting alleges it suffered were economic. Appellants therefore argue that Commercial Painting should be limited to the damages authorized under the contract and that the claimed damages that were not authorized by the parties' contract but flow from the tort claim—namely the award of punitive damages and pre- and post-judgment interest—should be reversed.

Commercial Painting does not appear to assert in this appeal that it is seeking recovery of anything other than economic losses. *Cf.* 🚩 *Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 173 (Tenn. Ct. App. 2001), *abrogated on other grounds by* 🔖 *Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102 (Tenn. 2016) (defining purely economic losses as "essentially damages for failed commercial expectations, or loss of the benefit of the bargain"). To be sure, Commercial Painting does not assert that it suffered any damage as a result of property damage or personal injury. Instead, Commercial Painting has always maintained that the economic loss rule simply did not bar it from raising a claim for intentional misrepresentation regardless of the fact that it suffered only economic losses.

The core of Commercial Painting's argument on this

issue, however, has been something of a moving target. In its initial brief, Commercial Painting's central argument was that the economic loss rule did not apply to any intentional torts. Following the **Milan Supply Chain** opinion, however, Commercial Painting's supplemental briefing focused not on the tort that occurred in this case, but on the context of the claim, *i.e.*, outside the realm of products liability. And Commercial Painting pointed to the express holding of **Milan Supply Chain** that there is no fraud exception if the misrepresentation that allegedly induced a party to enter into a contract concerns "the quality or character of the goods sold." *Id.* Thus, Commercial Painting asserts in this appeal that neither the economic loss rule nor the limited fraud exception recognized in **Milan Supply Chain** apply outside of the products liability realm. Because this case does not involve the sale of goods or product liability, Commercial Painting argues that the economic loss rule should not prohibit its intentional misrepresentation claim and any of the damages that flow therefrom.

We are therefore called to determine two interrelated questions: (1) whether Tennessee should adopt a version of the economic loss rule that limits a party to contractual damages, rather than tort damages, in a case outside the product liability context; and if so (2) whether the **Milan Supply Chain** limited fraud exception should apply in that situation. To be sure, the **Milan Supply Chain** decision does not address this question directly. As a result, we are essentially left to "read[ ] our [s]upreme [c]ourt's tea leaves" to determine the proper result in this case. *Dolan v. USAA Cas. Ins. Co.*, No. 107247, 1998 WL 246409, at *4 (Conn. Super. Ct. Apr. 6, 1998)* (internal quotation marks omitted) ("[R]eading our Supreme Court's 'tea leaves,' this court holds that the FFR does not bar the present action.") (quoting *State v. Brown*, 14 Conn. App. 605, 629, 543 A.2d 750, 762 (1988) ("This court on occasion has taken the step of reading our Supreme Court's "tea leaves" and predicting that, because of intervening decisions, the court would overrule prior cases and change its position."); *State v. Cooke*, No. IN-05-06-1529, 2010 WL 3734113, at *31 (Del. Super. Ct. Aug. 19, 2010)* ("One has to be careful when reading tea leaves. If there were an opportunity for the Supreme Court to announce a *per se* recusal rule, however, as Cooke argues, that was it, but it did not."); *E.H. by & through Hemenway v. Auto. Club Inter-insurance Exch.*, 57 Kan. App. 2d 109, 118, 447 P.3d 382, 389 (2019)* ("Our reading of the tea leaves in our Supreme Court's *O'Donoghue* opinion suggests that it would agree with ACIIE's position.").

**\*19** Each party points to evidence in the **Milan Supply Chain** opinion of its own position.[14] Commercial Painting

points, of course, to the express language of the supreme court's holding, which applies only to transactions involving goods. *Milan Supply Chain*, 627 S.W.3d at 154. Commercial Painting notes that this limitation harmonizes with the court's statement that it "has never applied the economic loss doctrine outside the products liability context, in which it originated." *Id.* at 153. Moreover, the court noted the confusion that is engendered by applying the rule outside of the products liability context. Indeed, our supreme court quoted several authorities that appear to take a dim view of the doctrine.

*Id.* at 145 (*citing* *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 407 (Fla. 2013) (calling the expansion of the doctrine "unwise and unworkable in practice"); *Grams v. Milk Prods., Inc.*, 283 Wis.2d 511, 699 N.W.2d 167, 181 (2005) (Abrahamson, C.J., dissenting) (comparing the doctrine to a villainous alien life form). As a result, Commercial Painting argues that the **Milan Supply Chain** opinion "may well have signaled that th[e] bounds [of the economic loss rule] need to be further limited in the future."

Appellants read the Tennessee Supreme Court's tea leaves differently. Importantly, Appellants point out that after discussing three different permutations of the narrow fraud exception, the Tennessee Supreme Court favored the reasoning of the Utah Supreme Court most heavily. *Healthbanc International*, of course, is itself a case outside the realm of products liability. 435 P.3d at 194. As Appellants point out, the rationale behind the adoption of a limited exception utilized by the Utah Supreme Court is therefore equally applicable to other types of contracts.

Appellants also point out that while the Tennessee Supreme Court has not *applied* the economic loss doctrine outside the products liability context, it has mentioned the doctrine outside this context. *See* *John Martin*, 819 S.W.2d at 431 (considering whether the plaintiff was entitled to recover for purely economic losses even though "[t]his is not a products liability case."). Following that lead, this Court has previously considered the rule outside of the products liability arena. *See* *Acuity v. McGhee Eng'g, Inc.*, 297 S.W.3d 718, 734 (Tenn. Ct. App. 2008) (holding that a claim for negligent misrepresentation was not barred by the economic loss rule even though the plaintiff and defendant lacked privity); *United Textile Workers*, 825 S.W.2d at 87 (barring a claim by plaintiffs for purely economic losses caused by negligence when the plaintiffs had no contractual relationship with the defendant).[15] As a result of these and similar cases, at least one federal court has concluded that the Tennessee Supreme Court would apply

the economic loss rule in cases that did not involve the sale of goods. *See Ladd Landing, LLC v. Tennessee Valley Auth.*, 874 F. Supp. 2d 727, 731 (E.D. Tenn. 2012) (disagreeing with *Ham v. Swift Transp. Co.*, 694 F. Supp. 2d 915, 922 (W.D. Tenn. 2010); *Lott v. Swift Transportation, Inc.*, 694 F. Supp.2d 923, 930–31 (W.D. Tenn. 2010)). All of our cases cited above, however, involve the first type of fact-pattern outlined by the Utah Supreme Court where a party seeks to hold another liable for economic damages in the absence of privity. *See Healthbanc International*, 435 P.3d at 196. This case, of course, involves the second fact pattern where the parties have a contract governing their rights and responsibilities.[16] As such, these authorities are not particularly helpful in resolving the dispute at issue here.

**\*20** While we agree that each party has valid and compelling arguments, we believe that Appellants' argument is more persuasive. First, we note that even the Tennessee Supreme Court recognized that "most states have not limited the doctrine to the products liability context[.]" *Milan Supply Chain*, 627 S.W.3d at 145. As the *Milan Supply Chain* opinion readily reveals, Tennessee courts do not always adopt the majority approach to an issue. *Id.* (adopting a non-majority narrow fraud exception). But Tennessee courts have found persuasive the fact that a majority of jurisdictions have adopted a proposed rule. *See, e.g., Morris v. State*, 21 S.W.3d 196, 200 (Tenn. Ct. App. 1999) ("No Tennessee case has recognized a parental cause of action for loss of society and companionship of an emancipated adult child. The majority rule in sister jurisdictions is persuasive that no such cause of action is viable.").

One of those cases following the majority rule is *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 223 P.3d 664 (2010). In *Flagstaff*, the Arizona Supreme Court considered, as a matter of first impression, whether to extend the economic loss rule to cases involving construction contracts. First, the court defined its preferred definition of the doctrine as "a common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Id.* at 667.

After detailing the history of the doctrine in Arizona, the Court considered whether "the underlying policies of tort and contract law in the construction setting" support application of the doctrine in that context. *Id.* at 669. According to the Arizona Supreme Court,

The contract law policy of upholding the expectations of the parties has as much, if not greater, force in construction defect cases as in product defect cases. Construction-related contracts often are negotiated between the parties on a project-specific basis and have detailed provisions allocating risks of loss and specifying remedies. In this context, allowing tort claims poses a greater danger of undermining the policy concerns of contract law. That law seeks to encourage parties to order their prospective relationships, including the allocation of risk of future losses and the identification of remedies, and to enforce any resulting agreement consistent with the parties' expectations.

Moreover, in construction defect cases involving only pecuniary losses related to the building that is the subject of the parties' contract, there are no strong policy reasons to impose common law tort liability in addition to contractual remedies. When a construction defect causes only damage to the building itself or other economic loss, common law contract remedies provide an adequate remedy because they allow recovery of the costs of remedying the defects, and other damages reasonably foreseeable to the parties upon entering the contract.

*Id.* at 669 (paragraph markers and citations omitted). Other courts have found this reasoning persuasive or adopted similar reasoning. *See Indianapolis-Marion Cty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 735 (Ind. 2010) (citing *Flagstaff*); *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 125 Nev. 66, 78, 206 P.3d 81, 89 (2009) (applying the economic loss rule in the context of a business construction contract); *see also Anderson Elec. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146, 153, 503 N.E.2d 246, 249 (1986) (applying the economic loss rule to a services contract because the only loss involved "disappointed commercial expectations" that could be recovered through a breach of contract action).

Of course, some jurisdictions have taken a dimmer view of the economic loss rule outside the product liability context. *See, e.g., NM-Emerald, LLC v. Interstate Dev., LLC*, 2021-NMCA-020, 488 P.3d 707, 712, ¶ 12 (declining to expand the economic loss rule to construction cases not based on any analysis of the policy considerations at play, but based on the inadequate briefing of the parties); *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 32, 276 Wis. 2d 361, 375, 688 N.W.2d 462, 469 (relying on the Uniform Commercial Code ("UCC") to hold that the economic loss doctrine does not apply to services contracts) (discussed in detail, *infra*). In particular, the Florida Supreme Court fairly

recently "return[ed] the economic loss rule to its origin in products liability." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 407 (Fla. 2013). While Commercial Painting apparently views the Tennessee Supreme Court's reference to this Opinion as signaling the limiting of the economic loss doctrine, we must view the reference to *Tiara Condominium Association* in the context of the *Milan Supply Chain* Opinion as whole. *Id.* at 153–54. Importantly, our high court declined to apply a broad fraud exception even after noting that it had been adopted in more jurisdictions than the narrow exception. *Id.* at 149. In Florida, however, their supreme court had previously held that the economic loss rule did not bar claims for fraud. *See id.* at 402–03 (citing *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 537 (Fla. 2004) ("Although parties in privity of contract are generally prohibited from recovering in tort for economic damages, we have permitted an action for such recovery in certain limited circumstances. One involves torts committed independently of the contract breach, such as fraud in the inducement."); *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238 (Fla. 1996)). The Tennessee Supreme Court, then, apparently does not share the same level of distaste for the economic loss doctrine as the Florida Supreme Court.

**\*21** Instead, we must conclude that the reasoning employed by the Tennessee Supreme Court in *Milan Supply Chain* hews most closely to the reasoning of those jurisdictions that have extended the economic loss rule beyond its origination. For example, in *Milan Supply Chain*, the Tennessee Supreme Court discussed the "scope and rationale" of the economic loss rule as an attempt not to "disrupt the parties' allocation of risk." *Milan Supply Chain*, 627 S.W.3d at 154 (quoting *Lincoln General*, 293 S.W.3d at 491). According to the Arizona Supreme Court, this policy has even greater force in the construction contract context, as contracts of this type are typically negotiated to have specific provisions detailing the allocations of risks and specifying remedies. *Flagstaff*, 223 P.3d at 669.

The Tennessee Supreme Court also relied heavily on the Utah Supreme Court's reasoning that contract law provides an adequate remedy in this situation:

> We are persuaded by the reasoning articulated by the Utah Supreme Court, which, as noted earlier, recently explained:
>
> > Contract law seems sufficient to make wronged

parties whole. When the contract terms contain the grounds for the tort claim, we see no reason to conclude that recovery under contract law is insufficient—"when a party is merely suing to recover the benefit of its contractual bargain, there is no inherent unfairness in limiting that party to a breach-of-contract claim." Wronged parties will still have access to traditional contract damages for breach, including expectation damages. And such parties will also have access to exceptional contract remedies—liquidated damages, rescission, etc.—where applicable. The possibility of liquidated damages seems particularly salient. If the parties to a contract with express warranties are concerned about the insufficiency of expectation damages[,] they can bargain for liquidated damages. And where they fail to do so it seems problematic for a court to make a better contract for them than the one they negotiated—by importing tort remedies into the deal.

HealthBanc International, 435 P.3d at 197–98 (quoting [ Louisburg Bldg. & Dev. Co. v.] Albright, [45 Kan.App.2d 618,] 252 P.3d 597,] 622 [Kan. Ct. App.] 2011).

*Milan Supply Chain*, 627 S.W.3d at 155. In fact, the Tennessee Supreme Court apparently judged this particular passage from *Healthbanc International* so important as to quote it in full twice in the *Milan Supply Chain* Opinion.

Like the *Flagstaff* court, we conclude that the concerns of the Utah Supreme Court, as echoed by our own high court, apply with equal force in the products liability context as in other commercial transactions between sophisticated parties. *See Flagstaff*, 223 P.3d at 669. Importantly, Tennessee law recognizes that our " 'public policy is best served by freedom of contract. ...' " *Baugh v. Novak*, 340 S.W.3d 372, 383 (Tenn. 2011) (quoting *Chazen v. Trailmobile, Inc.*, 215 Tenn. 87, 91, 384 S.W.2d 1, 3 (Tenn. 1964)). As the supreme court has explained:

> Tennessee, both in its statutory and case law, "recognize[s] a strong public policy of individual autonomy, i.e. freedom of contract, as courts allow parties to strike their own bargains, absent a supervening legal reason to restrict that economic liberty." 21 [Steven W.] Feldman[, *Tennessee Practice: Contract Law and Practice*] § 1:6, at 17. [(2006)]. The course of development of "[c]ontract law in Tennessee plainly reflects the public policy allowing competent parties to strike their own bargains." *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn.

2009).

*Baugh*, 340 S.W.3d at 383.

As a result, Tennessee law has long held that courts cannot rewrite the contracts of parties, even when the terms negotiated therein later prove burdensome or foolhardy. This principle applies with equal force to contracts outside the sale of goods arena; indeed, it is oft cited in cases involving construction contracts. *See, e.g.*, *Cameron Gen. Contractors, Inc. v. Kingston Pike, LLC*, 370 S.W.3d 341, 346 (Tenn. Ct. App. 2011) ("It is not the role of courts, even courts of equity, to rewrite contracts for dissatisfied parties."); *Baptist Mem'l Hosp. v. Argo Const. Corp.*, 308 S.W.3d 337, 345 (Tenn. Ct. App. 2009) ("[T]his is the allocation of risk to which the parties agreed in the sales contract, and this Court cannot rewrite the parties' contract because its terms later prove to be burdensome"). When sophisticated commercial entities negotiate specific terms that waive certain types of damages and remedies, no additional unfairness results when the transaction falls outside the realm of products liability. Instead, in both cases, a party is merely suing to recover the benefit of its bargain. *Id.* at 155 (quoting *HealthBanc International*, 435 P.3d at 197). And according to the Arizona Supreme Court, when the breakdown of a construction contract causes only economic losses, contract remedies provide an adequate remedy regardless of the fact that products liability is not at issue. *Flagstaff*, 223 P.3d at 669.

**\*22** Moreover, a party to a commercial construction contract is just as free as a party to a sales contract to negotiate exceptional contract remedies, such as liquidated damages, should they see fit. *See id.* (noting that a party to a construction contract can negotiate for "other damages reasonably foreseeable to the parties upon entering the contract"). A focus on remedies available under the UCC is therefore misguided. For example, in *Ham v. Swift Transp. Co.*, 694 F. Supp. 2d 915 (W.D. Tenn. 2010), a federal district court concluded that the economic loss doctrine should not apply to services contracts on the basis that parameters of the doctrine were laid out by the UCC. *Id.* at 922–23 (citing *Ins. Co. of North Am. v. Cease Elec. Inc.*, 276 Wis.2d 361, 688 N.W.2d 462, 467 (2004)) ("Application of the economic loss doctrine to cases involving defective products is not surprising, the court reasoned, because the [UCC] sets forth the full series of rights and remedies available to an aggrieved purchaser who suffers only economic losses.").[17] Because the Tennessee Supreme in *Ritter* "echoe[d] that rationale" of the Wisconsin Supreme Court, the district court declined to apply the economic

loss rule to the services contract at issue. *Id.* (citing *Ritter*, 912 S.W.2d at 133 & n.8).[18] Thus, to this particular federal district court, it is the UCC that provides the "justification" for the application of the economic loss rule; where the UCC is inapplicable, neither should the economic loss rule be applied. *Id.* at 923.

The *Milan Supply Chain* Opinion, however, does not bear out this reasoning. To be sure, the *Milan Supply Chain* Opinion makes clear that the economic loss rule originated in the context of products liability, where the UCC is applicable. *Milan Supply Chain*, 627 S.W.3d at 153. But the Opinion does not in any way rely on UCC principles in adopting its rule. In fact, the UCC is not mentioned in any fashion in the discussion of the economic loss rule. Instead, the rationale echoed upon by the *Milan Supply Chain* court was that of the Utah Supreme Court, which held that parties should be held to the damages that they bargained for. *Id.* at 155 (quoting *HealthBanc International*, 435 P.3d at 197). This rationale does not rest on the existence of UCC damages, but on contract principles that are applicable even outside the products liability context. *Cf.* *Argo Construction* 308 S.W.3d at 345; *see also* *Flagstaff*, 223 P.3d at 669.

Moreover, at least one scholar has suggested that allowing the economic loss rule to apply in any way when fraud is alleged would be to go against the UCC principles upon which the economic loss rule was founded. Specifically, in Steven W. Feldman, *The Economic Loss Doctrine: Rescuing Contract from Drowning in A 'Sea of Tort'*, Tenn. B.J., April 2008, at 24, the author argued that Tennessee would and should "adopt the broad position allowing full recovery for fraudulent inducement[.]" *Id.* at 28. The basis for this prediction was the fact that the economic loss doctrine originated with the UCC:

> The primary reason for this suggestion is the UCC itself, which marks the boundaries of the economic loss doctrine. Tenn. Code Ann. § 47-1-103 says that unless displaced by the UCC, the principles of law and equity pertaining to fraud and misrepresentation "shall supplement its provisions." To the same effect, Tenn. Code Ann. § 47-2-721 says that remedies for material misrepresentation or fraud include all remedies available

under title 47, chapter 2, for nonfraudulent breach. Therefore, it would violate Tennessee statutory law and our state's strong anti-fraud policy to deprive a plaintiff of a full remedy for fraud because of the economic loss doctrine.

**\*23** *Id.* (footnotes and some punctuation omitted).

In *Milan Supply Chain*, however, the Tennessee Supreme Court chose not to look to the roots of the economic loss doctrine to adopt a broad fraud exception. The requirements of the UCC, then, were not the most important considerations for the Tennessee Supreme Court in deciding how to apply the rule. Instead, when faced with several viable choices, it chose to rely on "a version of the narrow fraud exception" adopted outside the products liability context. *See Milan Supply Chain*, 627 S.W.3d at 155 (quoting *HealthBanc International*, 435 P.3d at 197). Thus, while the UCC may have been the progenitor of the economic loss rule, it is clear that Tennessee's version of the economic loss doctrine has expanded outside its origins.

Moreover, there is no dispute that in this case, like in *Milan Supply Chain*, the contract was negotiated by sophisticated commercial entities. Thus, the only question presented in this appeal is whether the economic loss rule should be extended to apply to non-products liability contracts between sophisticated commercial entities, and, if so, whether Commercial Painting's fraud claim is an exception to the rule. And like the Tennessee Supreme Court, our holding is limited only to that situation. *See Milan Supply Chain*, 627 S.W.3d at 153–54 (limiting its narrow fraud exception to contracts "between sophisticated commercial business entities"). Doing so defuses some of the concerns that led other courts to conclude that the economic loss rule should not apply to non-sales contracts. As explained by the United States Court of Appeals for the Seventh Circuit, the concerns that prompted the Wisconsin Supreme Court to exempt services contracts from the ambit of the economic loss rule are as follows:

Most service contracts, the Wisconsin Supreme Court reasoned (like those to mow the lawn or unclog a drain), are oral and informal and parties rarely hire

attorneys to allocate risks and limit remedies. In many service contracts, furthermore, the information disparities between the parties make it unlikely that each party can negotiate the terms with the same level of bargaining power.

*Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981 (7th Cir. 2005) (internal citations omitted) (citing *Cease Elec.*, 688 N.W.2d at 470–71). But these "policy considerations ... are simply not at play" when "well-represented, sophisticated business parties drafted complex, detailed agreements which could and indeed did allocate risks and assign remedies." *Id.* This court has previously expressed a similar sentiment that business plaintiffs should not be permitted to avoid their contractual obligations by inventing a tort action where a contract action suffices. *See Trinity Industries*, 77 S.W.3d at 172 (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 10–5, 580, 582–83 (4th ed. 1995)) (noting, in dicta, that "[c]ourts should be particularly skeptical of business plaintiffs who—having negotiated an elaborate contract or having signed a form when they wish they had not—claim to have a right in tort whether the tort theory is negligent misrepresentation, strict tort, or negligence"). Because our holding is limited to contracts negotiated by sophisticated commercial entities, these policy considerations are more than accounted for without having to take a "sledgehammer" to destroy the rights and obligations contained in the parties' contract. *Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009) ("In circumstances where public policy imposes limitations on the freedom of contract, Tennessee's courts are well-advised to wield a scalpel rather than a sledgehammer.")

**\*24** In sum, the Tennessee Supreme Court's reasons for adopting a limited fraud exception to the economic loss rule apply with equal force outside the products liability context when the contract at issue was negotiated between sophisticated commercial entities.[19] Here, both parties are sophisticated commercial business entities. The parties' contract was drafted after negotiation and investigation by the parties. The misrepresentations as issue here clearly involved the subject matter of the parties' agreement. Specifically, the question presented to the jury concerning Weitz's intention misrepresentation asked whether Weitz made false misrepresentations about the length of time Commercial Painting would have to perform its work or about the amount of work Commercial Painting would be

required to perform. Issues of time, duration, and the scope of work were covered by the Subcontract. There can also be little dispute that the damage that allegedly resulted from Weitz's tortious conduct completely overlaps with the damage that resulted from their breach of contract; indeed, Commercial Painting insists in this appeal that a single damage calculation included in an exhibit is proof of the damage that resulted from all the various causes of action that it asserts. As a result, we must conclude that Commercial Painting's fraud claim is barred by the economic loss rule and must be dismissed.

### D.

Commercial Painting asserts that even if the economic loss rule is applicable to bar it from raising a tort against Weitz, punitive damages may still be recovered under a contract theory. In support, Commercial Painting first asserts that *Commercial Painting II* "clearly stated that [ ] Commercial Painting had demonstrated a factual basis for an intentional misrepresentation claim, and that if successful, [ ] Commercial Painting would be entitled to pursue a claim for punitive damages." Thus, Commercial Painting appears to suggest that we are bound by that statement to allow punitive damages because the jury found that Weitz committed fraud. What was actually stated by the *Commercial Painting II* panel was that "[i]f Commercial Painting is successful on its intentional misrepresentation claim against Weitz, it *may* be entitled to recover punitive damages in addition to compensatory damages." 2016 WL 3519015, at *12 (emphasis added). But there was no discussion in that case of the economic loss doctrine, which we have held is applicable to bar Commercial Painting from raising its intentional misrepresentation claim. As such, *Commercial Painting II*'s intentional misrepresentation claim is barred by operation of law, and therefore not "successful."

Commercial Painting next asserts that Tennessee law does not recognize a "blanket prohibition against an award of punitive damages in a contract case." We generally agree with this statement. Punitive damages, while typically "not available in a breach of contract case," may be awarded in a breach of contract action under "certain circumstances." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (citations omitted). "[B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992).

Thus, the Tennessee Supreme Court appeared to equate egregious conduct with conduct that was committed intentionally, fraudulently, maliciously, or recklessly, so long as that culpability is proven by "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* at 901 n.3; *see also Vic Davis Constr., Inc. v. Lauren Engineers & Constructors, Inc.*, No. E2017-00844-COA-R3-CV, 2019 WL 1300935, at *7 (Tenn. Ct. App. Mar. 20, 2019) ("Punitive damages may be awarded for breach of contract but only in the most egregious cases. The egregious cases are those with clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly in breaching the contract.") (internal citation omitted) (citing *Rogers*, 367 S.W.3d at 211 n.14). *But see Sanford v. Waugh & Co.*, 328 S.W.3d 836, 849 (Tenn. 2010) (suggesting that egregiousness may be a separate issue from the culpable mental state: "[W]e agree with the trial court that ... a reasonable jury could not find by clear and convincing evidence that the Waughs' conduct was intentional, fraudulent, malicious, or reckless to such an extent as to justify punitive damages, nor could it possibly be found to involve the most egregious of wrongs.").

**\*25** Because the jury found that Weitz had engaged in the conduct meeting that culpability level under the clear and convincing evidence standard, Commercial Painting argues that this is the type of case in which punitive damages should be awarded. Specifically, Commercial Painting asserts that our only inquiry should be whether material evidence supports the jury's finding that Weitz engaged in egregious conduct intentionally, fraudulently, maliciously, or recklessly. *See Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 532 (Tenn. 2008) (holding that even where the burden of persuasion at trial is clear and convincing evidence, as in the case of the award of punitive damages, we utilize the material evidence standard to review the jury's verdict and do not reweigh the evidence).

We respectfully disagree. Importantly, as previously discussed, because the economic loss rule is applicable here, Commercial Painting is limited to its own contract remedies. *See Milan Supply Chain*, 627 S.W.3d at 152 (quoting *Lincoln General*, 293 S.W.3d at 491 ("[T]he remedies available ... should derive from the parties' agreements[.]")); *Milan Supply Chain COA*, 2019 WL 3812483, at *3–4 (citing Goodman et al., *supra*, at 55–56) (noting that the economic loss doctrine limits parties to "their contractual remedies"). Unlike the typical cases in which punitive damages have been awarded in breach of contract cases, the parties here agreed to

specific provisions related to the damages that could be recovered in relation to the Project. *See, e.g.*, *Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009) (affirming an award of punitive damages in a nuisance/contract case, noting the four arguments against the award, none of which involved any limitation on liability contained in the parties' contract); *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 909 (Tenn. 1999) (holding that the plaintiff could elect between statutory penalties and punitive damages, but mentioning no limitation on liability contained in the parties' contract nor any argument that the punitive damages were barred by any such contractual provision); *Dog House Invs., LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 916 (Tenn. Ct. App. 2014) (mentioning no limitation on liability nor any argument that the punitive damages were barred by such a contractual provision);[20] *Riad v. Erie Ins. Exch.*, 436 S.W.3d 256 (Tenn. Ct. App. 2013) (same); *Mohr v. DaimlerChrysler Corp.*, No. W2006-01382-COA-R3-CV, 2008 WL 4613584, at *14 (Tenn. Ct. App. Oct. 14, 2008) (same); *see also Rogers*, 367 S.W.3d at 212 (Tenn. 2012) (holding that the breach of contract was not egregious enough to support a claim for punitive damages; including no discussion of the terms of the contract vis-à-vis a limitation on damages); *cf. Sprint Sols., Inc. v. LaFayette*, No. 2:15-CV-2595-SHM-CGC, 2018 WL 3097027, at *16 (W.D. Tenn. June 22, 2018) (awarding punitive damages with no discussion of a contractual provision limiting liability or an argument based on such a provision).[21]

**\*26** In this case, item 11.6 of the Subcontract contains a rather broad limitation on damages that precludes recovery of anticipatory profit or indirect, special, or consequential damages. Even further, this section provides that Commercial Painting "specifically agrees that it shall not be entitled to assert, and it hereby waives, any Claims in quantum meruit, interest on late payments, or any other measure of damages other than as specifically provided in items 11.4 and 11.5 above." Items 11.4 and 11.5, however, authorize Commercial Painting generally only to receive the agreed upon Subcontract Sum. Finally, item 5.6 of the Subcontract provides that Commercial Painting is not entitled to any delay damages attributable to breach of contract, tort, or conduct not contemplated by the parties.

Commercial Painting argues in its brief, however, that item 5.6 does not waive punitive damages and that item 11.6 only concerns "termination rights." Appellants contend that these provisions affect a waiver of punitive damages. In resolving this dispute, we keep the following principles in mind:

The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used.

*Pylant v. Spivey*, 174 S.W.3d 143, 151 (Tenn. Ct. App. 2003) (internal quotation marks and citations omitted). "All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999).

The damages allowed under the Subcontract are governed by items 5.6, 11.4, 11.5, and 11.6. It is true that items 11.4 and 11.5 appear to apply only in the event of termination of the contract by Weitz—11.4 applying to termination for cause, while 11.5 applies to termination without cause. But item 11.6 is not so limited. Instead, it provides that "[i]n no event" shall Weitz be liable for damages for anticipatory profit, or indirect, special, or consequential damages. Further, the item states that Commercial Painting waives "any" damages not specified in items 11.4 and 11.5. Nothing in this particular provision indicates that these waivers apply only in the event of termination of the contract. Thus, we must conclude that item 11.6 provides for a limitation on damages that applies even outside the context of termination by Weitz.

Furthermore, we must conclude that the limitations contained in items 11.4, 11.5, and 11.6 constitute a broad and unqualified waiver of damages that are not among those permitted under the Subcontract. *Cf. Peregrine Pharms., Inc. v. Clinical Supplies Mgmt., Inc.*, No. SACV 12-1608 JGB ANX, 2014 WL 3791567, at *6 (C.D. Cal. July 31, 2014) (citing *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal.App.4th 1118, 1128, 147 Cal.Rptr.3d 634 (2012)) (holding that

contractual language that " 'in no event' is [defendant] liable for consequential, incidental, special or indirect damages" was "broad and unqualified language" that constituted a valid limitation on the plaintiff's claims). Specifically, item 11.6 limits the damages that can be recovered to only those damages specified in items 11.4 and 11.5. These items limit the types of damages that may be recovered to amounts related to the unpaid balance of the Subcontract Sum and for "work properly and timely performed and for proven loss with respect to unused materials, equipment, machinery, and tools[.]" Thus, these provisions clearly entitled Commercial Painting to *compensation* for the work it performed and its own costs.[22] Punitive damages, however, are not intended to compensate a wronged party; they serve as punishment for bad conduct. *Coffey v. Fayette Tubular Prod.*, 929 S.W.2d 326, 328 (Tenn. 1996) ("[P]unitive damages are not intended to compensate an injured plaintiff but may be awarded by the jury for the purposes of punishing wrongdoers and deterring them from similar conduct in the future."). Because the Subcontract clearly provides that the damages that are permitted are compensatory in nature and "any" other measure of damages was waived by Commercial Painting, we must conclude that the award of punitive damages is barred by the plain language of the parties' agreement.

**\*27** Commercial Painting offers no authority to suggest that a contractual waiver of punitive damages is wholly unenforceable under any circumstances. Indeed, limitations on liability are not disfavored in Tennessee:

> Historically, the "freedom of contract" has insured "that parties to an agreement have the right and power to construct their own bargains." Blake D. Morant, *Contracts Limiting Liability: A Paradox with Tacit Solutions*, 69 Tul. L. Rev. 715, 716 (1995). As with other types of contracts, the "terms of a lease should be binding on the parties thereto unless there is some overriding social policy that would be undermined by their enforcement." Restatement (Second) of Property, § 5.6 (1977). This Court has consistently recognized that the right of parties to allocate liability for future damages through indemnity clauses, generally, is not contrary to public policy. *See Crawford v. Buckner*, 839 S.W.2d 754, 756 (Tenn. 1992); *Houghland v. Security Alarms & Services, Inc.*, 755 S.W.2d 769, 773 (Tenn. 1988) (liability of burglar alarm service was limited by an exculpatory clause); *Turner*, 503 S.W.2d at 191 (customer assumed the risk of injury from negligence of a health spa); *Chazen v. Trailmobile, Inc.*, 215 Tenn. 87, 384 S.W.2d 1 (1964) (commercial lease absolved both landlord and tenant

from liability for a loss resulting from fire); *Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960) (renter assumed the risk incident to injury from the hiring and riding of a horse). Indeed, the allocation of risk agreed to by parties with equivalent bargaining powers in a commercial setting serves a particularly valid purpose where, as here, the contract delineates the parties' duty to obtain and bear the cost of insurance. *See Evco Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn. 1975); *Kellogg Co. v. Sanitors, Inc.*, 496 S.W.2d 472, 473 (Tenn.1973). Thus, even broad transfers of liability, where unambiguous, should be honored.

*Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 892–93 (Tenn. 2002). Although the *Planters Gin* case speaks often in terms of indemnity clauses, this Court has applied the rule to limitations on liability, such as are present in this case. *See Underwood v. Nat'l Alarm Servs., Inc.*, No. E2006-00107-COA-R3-CV, 2007 WL 1412040, at \*5 (Tenn. Ct. App. May 14, 2007) (applying the *Planters Gin* framework to a case involving a "limitation of liability/liquidated damages clause"). Courts from other states have specifically held that contractual waivers of punitive damages may be upheld in commercial contracts. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 232 (Tex. 2019) (holding that a limitation of damages clause in a commercial contract that prohibited the award of punitive damages was enforceable, even where fraud occurred, because the party complaining did not seek to rescind the agreement in its entirety, but chose to attempt to enforce the agreement without being bound by the limitation on damages).[23]

**\*28** There are, of course, some exceptions to this rule. *See Planters Gin*, 78 S.W.3d at 893 (discussing exceptions related to indemnity agreements in construction settings, landlord/tenant agreements, and in medical settings). In a fashion, Commercial Painting argues that one exception is present in this case: fraud. Specifically, Commercial Painting argues that it defies logic to allow a party to take advantage of the limiting terms of a contract when the contract was procured by fraud. Commercial Painting is correct, in part. Specifically, the Tennessee Supreme Court has held that "[l]imitations against liability for negligence or breach of contract have generally been upheld in this state in the absence of fraud or overreaching." *Houghland*, 755 S.W.2d at 773. The problem, of course, with this argument is that under economic loss rule and the limited fraud exception adopted by the Tennessee Supreme Court, Commercial Painting cannot utilize a claim of fraud to avoid the consequences of its own contractual agreements. *See Milan Supply Chain*, 627 S.W.3d at 155. Indeed, limiting

parties to their agreed upon contractual remedies is the very purpose of the economic loss rule when applicable to a situation that is governed by a contract. *See* *Milan Supply Chain COA*, 2019 WL 3812483, at *4. And, when the rule is applicable, this limitation applies even where fraud is present if the contract is between sophisticated commercial entities and results in only economic losses, as is the case here. *See* *Milan Supply Chain*, 627 S.W.3d at 155. As such, to allow punitive damages that have been clearly waived under the Subcontract would essentially be to negate the entire purpose of the economic loss rule as it applies in this specific case. We decline to do so. Because Commercial Painting offers no other basis from which to avoid the consequences of its own agreements, we reverse the award of punitive damages as not authorized by the Subcontract. All remaining issues related to the punitive damages award are therefore pretermitted.

### E.

We next address Appellants' contention that the trial court failed to independently evaluate the jury's verdict or act as the thirteenth juror in this case. In particular, Appellants urge us to reverse the trial court's ruling because "the record provides no insight into the trial court's decision-making process[,]" citing *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303 (Tenn. 2014). Respectfully, Appellants' argument misapprehends the proper framework applicable to this question.

Importantly, *UHS of Lakeside* involved a question of summary judgment. *Id.* at 304. Under Rule 56.04 of the Tennessee Rules of Civil Procedure, "[t]he trial court shall state the legal grounds upon which the court denies or grants [a] motion" for summary judgment. The rule in *UHS of Lakeside* requiring the trial court to thoroughly explain its reasoning applies as a result of this mandate. We have also expanded this rule to other cases in which trial courts are required to explain their rulings, such as bench trials. *See, e.g.*, *In re Colton B.*, No. M2017-00997-COA-R3-PT, 2017 WL 6550620, at *3 (Tenn. Ct. App. Dec. 22, 2017) ("Thus, it appears that the holding in [*UHS of Lakeside*] is equally applicable in other cases where trial courts are required to make findings of fact and conclusions of law, such as following bench trials in termination proceedings.").

It is true that trial courts are required to make findings of fact and conclusions of law in support of punitive damages awards. *See* *Hodges v. S.C. Toof & Co.*, 833

S.W.2d 896, 902 (Tenn. 1992) ("After a jury has made an award of punitive damages, the trial judge shall review the award, giving consideration to all matters on which the jury is required to be instructed. The judge shall clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed."). But we have reversed the award of punitive damages in this case. As such, the only remaining damages awarded by the jury are the compensatory damages.

Appellants are correct that when the motion for new trial was filed, the trial court was then "under a duty to independently weigh the evidence and determine whether the evidence 'preponderate[d]' in favor of or against the verdict." *Blackburn v. CSX Transp., Inc.*, No. M2006-01352-COA-R10-CV, 2008 WL 2278497, at *6 (Tenn. Ct. App. May 30, 2008) (footnote omitted) (citing *Woods v. Herman Walldorf & Co., Inc.*, 26 S.W.3d 868, 873 (Tenn. Ct. App. 1999); *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996); *Witter v. Nesbit*, 878 S.W.2d 116, 121 (Tenn. Ct. App. 1993)). This role is referred to as the "thirteenth juror." *Id.* (citing *Holden v. Rannick*, 682 S.W.2d 903, 904–05 (Tenn. 1984)). When the trial court fulfills this duty, however, it is not required to make detailed findings of fact or conclusions of law explaining its reasoning:

> *29 The discretion permitted a trial judge in granting or denying a new trial is so wide that our courts have held that he or she does not have to give a reason for his ruling. If the trial judge does give reasons, the appellate court will only look to them for the purpose of determining whether the trial court passed upon the issue and was satisfied or dissatisfied with the verdict. If the trial judge does not give a reason for her action, the appellate courts will presume she did weigh the evidence and exercised her function as thirteenth juror.

*Buckley v. Elephant Sanctuary in Tennessee, Inc.*, -- S.W.3d --, 2021 WL 2450456, at *5 (Tenn. Ct. App. June 16, 2021), *perm. app. denied* (Tenn. Oct. 14, 2021) (quoting *Blackburn*, 2008 WL 2278497, at *7 (citation

omitted)). Thus, a trial court need not make detailed findings to support its approval of a jury verdict.

From our reading of Appellants' brief, they do not take issue with the trial court's order approving the jury's verdict or the order denying the motion for new trial. Instead, they are primarily concerned with the December 12, 2018 order approving the award of punitive damages; we, however, have reversed the award of punitive damages on other grounds. Given that Appellant's argument under **UHS of Lakeside** does not appear directed specifically at the orders approving the compensatory damages and the law clearly provides the trial court with wide discretion in approving a jury verdict, we decline to assign error as to those orders. *See Sneed v. Bd. of Pro. Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

Thus, we are left with the jury's verdict awarding Commercial Painting compensatory damages for breach of contract in the amount of $1,729,122.46. Although the economic loss rule bars Commercial Painting from recovering in tort, it is clearly entitled to seek compensation for breach of contract against Weitz. Throughout their brief, Appellants take issue with the award of compensatory damages in various respects. For example, in the facts section of their brief, Appellants question whether Commercial Painting should be entitled to any compensatory damages when it made a profit on the Project. In their conclusion, Appellants ask that the verdict from the 2016 bench trial of $450,000.00 be reinstated. We note, however, that Appellants have not designated any issue that the jury's award of $1,729,122.46 for breach of contract was unsupported by material evidence. *See Crabtree Masonry Co. v. C & R Const., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978) ("It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict[.]"). Nor have they properly raised and argued that this award is somehow barred by the Subcontract. As we previously explained, errors are generally waived when they are not designated as issues, but merely argued in the body of a brief. *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). Because Appellants designated no issue that would undermine the jury's verdict for compensatory damages, other than the issues

we have already analyzed, we must affirm the verdict of $1,729,122.46 in favor of Commercial Painting for breach of contract.

### F.

**\*30** The parties next dispute whether the trial court erred in awarding pre- and post-judgment interest in this case. In support of its argument that an award of interest was not authorized by the Subcontract, Appellants again cite item 11.6, which expressly provides that Commercial Painting waives "any Claims ... [for] interest on late payments, or any other measure of damages other than as specifically provided in items 11.4 and 11.5 above." In support of its claim for interest, however, Commercial Painting relies on provisions of the Prime Contract that it argues were expressly incorporated into the Subcontract. Specifically, Commercial Painting cites item 11.7 of the Prime Contract, which specifically allows interest on "[a]ny amounts payable hereunder which are not paid when due." As support for its argument that this provision is applicable to a claim under the Subcontract, Commercial Painting cites item 1.2 of the Subcontract, which provides that Commercial Painting "shall be entitled to the same benefits and rights which [Weitz], under the Prime Contract, is granted against the Owner." Commercial Painting also cites a portion of item 1.8, which provides that the "Subcontract Documents," including the Prime Contract, "form the contract between the parties thereto, and are as fully a part of the Agreement as is attached therefore or repeated therein."

The problem with Commercial Painting's argument, however, is that it omits key language from item 1.8 of the Subcontract. Specifically, item 1.8 states that "[i]n the event of any conflicts in the Subcontract Documents, the provisions shall govern in priority in the order listed in this Section 8."[24] Item 11.6 governing the damages available is contained in Exhibit D to the Subcontract and is therefore fifth in the order of priority; the Prime Contract is listed as ninth in the order of priority.[25] So the Subcontract clearly provides that where a conflict arises between the language of the Prime Contract and item 11.6, item 11.6 controls. Thus, the Subcontract clearly and unequivocally waives any claim for interest on late payments. Again, Commercial Painting raises no argument that such an agreement is unenforceable. Indeed, Commercial Painting points to a statute that generally permits parties to contract regarding interest. *See* Tenn. Code Ann. § 47-14-123 ("In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default

within the limits set by § 47-14-103."); *see also* Tenn. Code Ann. § 47-14-103 (providing for maximum interest rates). As such, we must conclude that Commercial Painting waived any claim for interest in this case. The award of pre- and post-judgment interest is therefore reversed.

### G.

The next issue involves attorney's fees. The trial court awarded Commercial Painting costs and attorney's fees in the amount of $1,103,549.00. It is undisputed that the Subcontract provides as follows:

> In the event it shall become necessary for either party to institute legal proceedings against the other party for recovery of any amounts due and owing under the Agreement, it is expressly agreed that the prevailing party in any such action shall be entitled to recover from the non-prevailing party all costs, including reasonable attorney's fees, of pre-suit collection attempts, suit, and post judgment or settlement collection including those incurred on appeal.

As our high court has explained of "mandatory fee award provision[s]" of this type:

> Our courts long have observed at the trial court level that parties are contractually *entitled* to recover their reasonable attorney's fees when they have an agreement that provides the prevailing party in a litigation is entitled to such fees. In such cases, the trial court does not have the discretion to set aside the parties' agreement and supplant it with its own judgment. The sole discretionary judgment that the trial court may make is to determine the amount of attorney's fees that is reasonable within the

circumstances.

*31 *Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017) (citations omitted). When attorney's fees are limited to a "prevailing party," however, the trial court must also determine which party prevailed. According to the Tennessee Supreme Court:

> A "prevailing party" is "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *Buckhannon* [*Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*], 532 U.S. [598,] 603, 121 S.Ct. 1835 [149 L.Ed.2d 855 (2001)]. The Court has also noted that a party need not attain complete success on the merits of a lawsuit in order to prevail. Rather, a prevailing party is one who has succeeded " 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.' " *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978)).

*Fannon v. City of LaFollette*, 329 S.W.3d 418, 431 (Tenn. 2010).

Commercial Painting contends that it was the prevailing party in the trial court. As such, it asserts that the attorney fees award by the trial court should be affirmed, and asks that it be awarded attorney's fees on appeal. In contrast, Appellants assert that Commercial Painting should not be awarded any attorney's fees; Appellants do not, however, seek an award of attorney's fees in their favor, either at trial or on appeal.

We conclude that despite the reversal of much of the damages in this case, Commercial Painting did prevail in the trial court, in that it was awarded substantial compensatory damages. Because the costs and attorney's fees awarded by the trial court do not segregate those costs and fees solely associated with the compensatory damages award, however, we deem it necessary to vacate the award and remand to the trial court for reconsideration. On remand, the trial court shall determine the reasonable costs and attorney's fees incurred by Commercial Painting in securing the award of compensatory damages in the trial court proceedings. We must conclude, however, that in obtaining reversal of a significant portion of the damages awarded by the jury in this appeal, Appellants are properly termed the prevailing party of this appeal. Commercial Painting is therefore not entitled to attorney's fees incurred on appeal.

## IV. CONCLUSION

The judgment of the trial court is affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellee Commercial Painting, Inc.,

for which execution may issue if necessary.

**All Citations**

Slip Copy, 2022 WL 737468

## Footnotes

1     Specifically, item 11.4 provides as follows:

**11.4 <u>Consequences of Termination for Cause</u>**

Upon termination of [Commercial Painting's] continuing performance under the Agreement for cause, [Weitz] may without limitation of any other available remedies, proceed as follows: (i) direct [Commercial Painting] to immediately leave the site, but to give possession of all materials and supplies at the site and stored off-site, to [Weitz] for use in completing [Commercial Painting's] work; in the event of such a directive to leave the site, [Commercial Painting] agrees to do so immediately, even if it disputes the grounds for the directive; [Weitz] shall also provide or cause to be provided such other materials, supplies, tools, equipment, machinery, labor, services and other items as may be necessary to complete [Commercial Painting's] Work; or (ii) by registered or certified mail addressed to [Commercial Painting's] surety, if any, require the surety to provide such materials, supplies, tools, equipment, machinery, labor, services and other items as may be necessary to complete [Commercial Painting's] work in strict compliance with the Subcontract Documents. [Weitz] shall apply any unpaid balance of the Subcontract Sum to pay for such completion costs; provided, that [Weitz] may first require [Commercial Painting] or its surety, if any, to pay any anticipated excess completion costs. In all such events, if the unpaid balance of the Subcontract Sum exceeds the costs of completing [Commercial Painting's] Work together with interest on such costs and together with any offsets and deductions available to [Weitz], such excess shall be paid to [Commercial Painting]. However, if such costs, interest, deductions, and offsets exceed such unpaid balance, [Commercial Painting] or [Commercial Painting's] surety shall pay the difference to [Weitz] upon demand.

2     Item 11.5 provides as follows:

**11.5 <u>Convenience</u>**

[Weitz] may terminate the Agreement at any time for the convenience of [Weitz] (i.e, without cause), upon written notice thereof to [Commercial Painting]. In such event, [Commercial Painting] shall be entitled to pro-rata payment of the Subcontract Sum for [Commercial Painting's] work properly and timely performed and for proven loss with respect to unused materials, equipment, machinery, and tools, to the extent recoverable by [Weitz] from the Owner. If [Weitz] is found to have improperly terminated [Commercial Painting's] continuing performance under items 11.1, 11.2, or 11.3, it shall be deemed to have elected to terminate the Agreement for convenience under this item 11.5.

Item 11.1 deals with a default in performance by Commercial Painting; item 11.2 deals with the bankruptcy or dissolution of Commercial Painting; item 11.3 deals with issues of labor relations and work stoppages.

3     Other parties were named as defendants in the original complaint. They are not at issue in this appeal.

4     No claim for rescission was submitted to the jury.

5     The verdict form gave the jury the choice of either intentional misrepresentation or negligent misrepresentation. The jury chose the former. As such, the claim of negligent misrepresentation is not at issue in this appeal.

6   Specifically, the verdict form asked the jury, once it found a material breach of the Subcontract, to "enter the amount of damages [the sureties] are liable for under the terms of the surety bond they issued at the request of [Weitz] for the [ ] Project." The jury answered with the full amount of damages awarded against Weitz.

7   Weitz was liable for the entire judgment; the sureties were not held liable for the punitive damages or the attorney's fees and costs, but were jointly and severally liable for the remainder of the award.

8   Appellants essentially raise this argument, with slight differences, twice in their appellate brief. Specifically, in addressing the jury instructions provided to the jury in their initial brief, Appellants point to only two examples as evidence that the jury was confused: (1) that the jury awarded damages under inconsistent theories; and (2) that the jury awarded the same amount of damages under multiple theories. We therefore will not tax the length of this Opinion with a second analysis of these concerns. In their reply brief, Appellants raise an additional argument concerning the lack of jury instruction delineating Weitz's duty to disclose. Reply briefs, however, are not vehicles for raising new arguments. *See Clayton v. Herron*, No. M2014-01497-COA-R3-CV, 2015 WL 757240, at *3 (Tenn. Ct. App. Feb. 20, 2015) (" It would be fundamentally unfair to permit an appellant to advance new arguments in the reply brief, as the appellee may not respond to a reply brief.").

9   We note that Appellants frame this issue as related to an inconsistent jury verdict. They did not designate an issue that the jury's verdict as to any particular theory was unsupported by material evidence. To the extent that Appellants allude to this issue in the body of their brief, such arguments are waived, as discussed *infra*. *See Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) ("We consider an issue waived where it is argued in the brief but not designated as an issue.").

10  We will revisit the proof presented of damages, however, later in this Opinion with regard to issues that were properly preserved on appeal.

11  Appellants do not argue in their appellate brief that the right to a jury trial triggered under Rule 38.02 applies only to the new issues, rather than all the issues in the case. Instead, they argue only that there were no new factual issues alleged and that a jury trial should not have been permitted as to *any* issue. As such, this Opinion should not be read to offer any opinion on that question.

12  As the Tennessee Supreme Court has explained, " 'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action. In this Opinion, we will refer to the cause of action as a claim for intentional misrepresentation, and, in order to avoid confusion, we suggest that this term should be used exclusively henceforth." *Hodge v. Craig*, 382 S.W.3d 325, 342–43 (Tenn. 2012) (citation and footnote omitted). Thus, fraud and intentional misrepresentation are used interchangeably in this Opinion.

13  To the extent that the independent duty rule is part of the economic loss rule, however, we will consider it, *infra.*

14  The *Milan Supply Chain* decision was issued following the close of briefing in this case. Both parties were thereafter permitted to file supplemental briefs as to its effect, if any, on the issues presented in the case-at-bar.

15  Again, however, these cases deal with the non-contractual economic loss rule.

16  The *John Martin* Opinion certainly cuts both ways in this case, as the Tennessee Supreme Court held that the plaintiff could assert a claim for negligent misrepresentation despite a lack of privity. This Court, however, has held that in the products liability context, no claim for negligent misrepresentation is viable. *See City of Franklin*, 634 S.W.3d at 35.

17    Although services contracts are specifically exempted from the economic loss doctrine under Wisconsin law, it is not clear that all non-products liability contracts are exempted from the ambit of the rule. Specifically, in *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, 262 Wis. 2d 32, 662 N.W.2d 652, the Wisconsin Supreme Court applied the economic loss rule to a case involving a contract authorizing the plaintiff to sell and distribute the defendant's products to consumers. *Id.* at 655. Although the case tangentially involved products, the contract was not for the sale of goods and the theory of liability against the defendant was not related to a defective product. *Id.* at 656. Although the **Cease Electric** court cites *Digicorp*, it does not address this issue or explicitly overrule the prior case.

18    The same federal district court judge also came to this conclusion in *Lott v. Swift Transportation, Inc.*, 694 F. Supp.2d 923, 930–31 (W.D. Tenn. 2010). The reasoning in both Opinions is identical.

19    Like our supreme court, we decline to announce a broad rule that expands the economic loss rule to all contracts that do not involve such parties.

20    We also note that some of the cases involving punitive damages in a breach of contract action suggest that an accompanying tort may be required. *See Vic Davis Construction*, 2019 WL 1300935, at *7 (citing *Restatement (Second) of Contracts* § 355 (Am. Law Inst. 1981) ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.")); *Dog House Investments*, 448 S.W.3d at 916 (granting the punitive damages not on the breach of contract, but on a claim of promissory fraud); *Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 866 (Tenn. Ct. App. 2000) ("[I]n the absence of fraud, there is no basis for punitive damages[.]"). In this case, the economic loss doctrine prevents Commercial Painting from asserting a tort claim.

21    Likewise, none of the foregoing cases contained any indication that the economic loss rule was considered by the court.

22    Item 11.5 further provides that that the damages are limited to those recovered by Weitz from the owner. This provision has no relevancy to the question of punitive damages, but only to the compensation that is owed under the Subcontract.

23    The parties agree that Commercial Painting abandoned its claim for rescission. Specifically, in its brief, Commercial Painting asserts that it had the choice to either seek rescission of the contract "or take the benefits of the contract it was fraudulently induced to enter, and pursue its damages available under the contract." According to Commercial Painting, it could not pursue rescission because it could not be placed in the same position it occupied prior to the transaction. But as this case clearly shows, neither was Commercial Painting satisfied with the "damages available under the contract."

24    Item 1.8 contains some caveats to this rule regarding issues of performance and conflict with large-scale drawings. Neither is at issue here.

25    Specifically, item 1.8 states as follows:
The "Subcontract Documents" consist of (i) Exhibit F, any Modifications to the Standard Form subcontract Agreement Between [Weitz] and [Commercial Painting] ("Agreement") entered into after the date of the Agreement; (ii) Exhibit A; (iii) the Agreement; (iv) Exhibit C; (v) Exhibit D; (vi) Exhibit B; (vii) any other Exhibits to the Agreement in letter order; (viii) [Commercial Painting's] payment bond and its performance bond, if required; and (ix) the Prime Contract.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    28

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.